**SILVER REED AMERICA, INC. and Silver Seiko, Ltd., Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

**Consumer Products Division, SCM Corporation, Intervenor.**

**Court No. 80–6–00934.**

United States Court of International Trade.

Feb. 1, 1984.

Wald, Harkrader & Ross, Washington, D.C. (Noel Hemmendinger, Christopher Dunn and William J. Clinton, Washington, D.C., of counsel), for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C., and Velta A. Melnbrencis, New York City, for defendant.

Stewart & Stewart, Eugene L. Stewart, Terence P. Stewart and James R. Cannon, Jr., Washington, D.C., Edwin Silverstone, Vice President and Gen. Counsel, Consumer Products Div., SCM Corp., Michael M. Maloney, Group Counsel, Smith Corona Group, SCM Corp., New York City, of counsel for defendant-intervenor.

BERNARD NEWMAN, Senior Judge:

This action represents a sequela to *Brother Industries, Ltd. v. United States,* 3 C.I.T. 125, 540 F.Supp. 1341 (1982), *aff'd sub nom. Smith Corona Group, Consumer Products Division, SCM Corporation v. United States,* 713 F.2d 1568 (Fed.Cir. 1983), and presents additional issues of novel impression concerning the determination of foreign market value having far-reaching implications for the administration of this nation's antidumping law, 19 U.S.C. § 1673, *et seq.*[1]

Presently before the Court are plaintiffs' motion pursuant to Rule 56.1 of the rules of the Court of International Trade for review of the administrative determination upon the agency record, and cross-motions by the Government and intervenor seeking affirmance of the contested final antidumping duty determination and order.

---

**1.** While the *Brother* action and *Smith Corona* appeal were *sub judice,* plaintiffs did not proceed in the present action, commenced on June 6, 1980, except for the filing of a complaint on July 3, 1980 and discovery. Upon the submission of plaintiffs' motion under Rule 56.1(a) of the rules of this Court, intervenor cross-moved for dismissal for lack of prosecution. By order dated June 22, 1983, plaintiffs' motion under Rule 56.1(a) was granted and intervenor's cross-motion to dismiss was denied. 5 CIT ——, 565 F.Supp. 1047 (1983).

Extensive oral argument was held on December 6, 1983.

### Background

On March 21, 1980 the United States Department of Commerce, International Trade Administration ("Commerce" or "ITA"), published its final affirmative determination of sales at less than fair value ("LTFV") with respect to portable electric typewriters ("PETs") from Japan (45 Fed. Reg. 18416), and subsequently on May 9, 1980 Commerce published its antidumping duty order (45 Fed.Reg. 30618). Plaintiffs Silver Seiko, Ltd., a Japanese manufacturer and exporter of PETs, and Silver Reed America, Inc., its wholly-owned importer (hereinafter "Silver" when jointly referred to) instituted this action on June 6, 1980 under section 516A(a)(2) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2), to contest the above final determination and order. Consumer Products Division, SCM Corporation is the sole remaining domestic producer of PETs and has intervened in support of ITA's determination and order.

Specifically, Silver claims:

(1) In calculating foreign market value, ITA erred by limiting the deduction of home market selling expenses to the amount of selling expenses incurred in the United States pursuant to the exporter's sales price ("ESP") offset cap. Silver contends that the offset cap is invalid.[2]

(2) ITA erred in refusing to grant an adjustment to foreign market value to account for the difference in levels of trade in the two markets. Silver argues that it sold only to wholesalers in the United States and only to retailers in the Japanese home market.

(3) ITA erred in calculating foreign market value on the basis of home market sales since sales of PETs in Japan formed an inadequate basis of comparison with sales of PETs sold in the United States.

(4) ITA erred in refusing to deduct from home market prices the cost of delivering typewriters from the factory to a central warehouse.

Silver requests that the antidumping duty order be dissolved and that the Court direct ITA to issue a negative determination, or alternatively, to remand the case to ITA for a new determination.

### ESP Offset Cap

■ In arriving at its final LTFV determination, ITA compared foreign market value, as defined in 19 U.S.C. § 1677b, with the ESP, as defined in 19 U.S.C. § 1677a(c). Acting in accordance with 19 CFR § 353.-15(c),[3] ITA limited the deduction of "indirect" home market selling expenses in its calculation of foreign market value to the per-unit amount of selling expenses incurred in sales to the United States. The foregoing limitation, referred to herein as the "ESP offset cap", means that in calculating foreign market value, home market selling expenses are "offset" only to the extent of the deduction for United States selling expenses.

Plaintiffs contend that ITA should have made an adjustment in calculating foreign market value for *all* general selling expenses incurred in the home market, since the ESP offset cap in section 353.15(c) is invalid. Specifically, Silver contends: (1) the ESP offset cap violates 19 U.S.C. § 1677b(a)(4) in that the cap prevents adjustment for differences in circumstances of sale even though such adjustment is

---

**2.** Silver's argument was alluded to by this Court in *Brother* (3 C.I.T. at 143, 540 F.Supp. at 1359, n. 15), but was not addressed since there was no challenge by *Brother* or *Silver* to the ESP offset limitation. The issue in *Brother* was whether the offset itself was invalid, as claimed by Smith Corona.

**3.** This regulation, in pertinent part, reads: "(c) *Special rule.* Notwithstanding the criteria for adjustments for differences in circumstances of sale set forth in paragraphs (a) and (b) of this section, * * * [i]n making comparisons using exporter's sales price, reasonable allowance will be made for all actual selling expenses incurred in the home market *up to the amount of the selling expenses incurred in the United States market.*" (Emphasis added.)

required by the statute; (2) the cap frustrates the intent of the antidumping law insofar as it prevents a comparison of prices in two markets on comparable terms; and (3) the offset cap lacks any rational basis "in that it is a compromise with an arbitrary limitation adopted in purchase price transactions" (Brief, at 7).

Defendant and intervenor insist that the ESP offset cap constitutes a valid exercise of administrative discretion. However, intervenor further posits that the ESP offset itself is contrary to the antidumping law and the "direct relationship" rule generally applicable to circumstances of sale adjustments under 19 CFR § 353.15(a) (as unsuccessfully argued by intervenor in *Smith Corona, supra*), and consequently the cap "serves the underlying statutory purpose by limiting the 'anomalous' effect on the statutory scheme which the ESP offset causes" (Brief, at 8).

I conclude that the ESP offset cap is invalid, as claimed by plaintiffs.

As noted above, in calculating the United States price for the PETs sold by Silver Seiko, Ltd. through Silver Reed America, Inc., ITA utilized the ESP provisions in 19 U.S.C. § 1677a(c), (d) and (e). Those provisions require that Silver's resale price to its customers in the United States be used as the starting point for determining United States price and a deduction of, *inter alia*, "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." 19 U.S.C. § 1677a(e)(2). Under the latter provision ITA deducted all general, administrative, overhead and other selling expenses incurred in the United States that were allocable to PETs. In making its calculation of foreign market value, ITA followed 19 CFR § 353.15(c) and deducted from the home market price the same kinds of general, administrative, overhead and other selling expenses. However, ITA did not deduct from the home market price *all* general selling expenses comparable to the United States expenses. Rather, as previously noted, pursuant to the ESP offset cap in 19

CFR § 353.15(c), ITA limited the deduction of home market selling expenses to the per-unit amount of selling expenses incurred in United States sales by Silver Reed America.

In support of the validity of the offset cap, defendant and intervenor rely upon the rationale of *Smith Corona, supra*, stressing ITA's broad discretion in the administration of the antidumping law. But Judge Smith, writing for the CAFC in *Smith Corona*, and discussing the very provisions now before the Court, admonished (713 F.2d at 1571):

> While the [antidumping] law does not expressly limit the exercise of that [broad] discretion with precise standards or guidelines, some general standards are apparent and these must be followed. *The Secretary [of Commerce] cannot, under the mantle of discretion, violate these standards or interpret them out of existence.* [Emphasis added.]

In *Smith Corona*, the CAFC set forth a comprehensive overview of the relevant price comparisons involved in the determination of LTFV sales under the antidumping law, and here I need only emphasize that Court's observation that both foreign market value and United States price "are subject to adjustment in an attempt to reconstruct the price at a specific 'common' point in the chain of commerce, *so that value can be fairly compared on an equivalent basis.*" 713 F.2d at 1571–72 (emphasis added).

In *Smith Corona*, appellant challenged the validity of the regulations under which several of the contested adjustments were made, and the CAFC prefaced its discussion concerning the regulations by the following pertinent comment (713 F.2d at 1575):

> With respect to the validity of the challenged regulations, the relevant inquiries are whether the regulations are a proper exercise of the Secretary's authority and are reasonable [footnote omitted]. In determining the reasonableness of the regulations, we are guided by the normal aids of statutory construction: statutory

language; legislative history; and legislative purpose.

Turning its attention to the ESP offset regulation, the Appellate Court found that this special adjustment "is supported by the Government as a means to redress a perceived unfairness in the computation of foreign market value under the statute". 713 F.2d at 1572. On that aspect, the Court observed that section 1677a(e)(2) provides for certain adjustments to ESP that increase the dumping margin, while the offset prescribed by 19 CFR § 353.15(c) allows adjustments to foreign market value that reduce the margin. The Court then went on to state (713 F.2d at 1577–78):

> The statute provides for the adjustment of United States price for certain specified "direct costs" [footnote omitted]. Section 1677a(e), however, provides for the adjustment of only exporter's sales price for certain "indirect costs"— selling expenses [footnote omitted]. Commerce perceived that the United States price based on exporter's sales price was distorted by the adjustment for indirect costs and, accordingly, promulgated 19 C.F.R. § 353.15(c) to afford a similar adjustment to foreign market value [footnote omitted].

Although in the present case intervenor again asserts that the ESP offset itself is invalid (and therefore should not, in effect, be expanded by removing the cap), *Smith Corona* held that the offset regulation (19 CFR § 353.15(c)) was valid *insofar as it was challenged.*[4]

With reference to the structure of the fair value computation under the statute, the CAFC made the following observations in *Smith Corona* which are especially significant to the issue raised here concerning the offset cap (713 F.2d at 1578):

> One of the goals of the statute is to guarantee that the administering authority makes the fair value comparison on a fair basis—comparing apples with apples. The offset appears to generate two fair value comparisons, apples with ap-

ples (purchase price) and oranges with oranges (exporter's sales price). The difference between United States price generated from purchase price and from exporter's sales price was created by the statute. Were it not for the exporter's sales price offset, comparisons based on purchase price would be fair, yet comparisons based on exporter's sales price would be skewed in favor of a higher dumping margin. We do not believe that the statute requires the Secretary to compare both apples and oranges with only apples. Rather, it expressly requires a fair comparison. The offset is an attempt to achieve such a comparison.

Since, as stressed by the CAFC, the antidumping law expressly requires a fair comparison of prices in two markets, the ESP offset itself clearly aims at such comparison. In the same vein, this Court pointed up the fair comparison objective of the ESP offset in *Brother* (3 C.I.T. at 142, 540 F.Supp. at 1358):

> Specifically, the purpose of the exporter's sales price offset is to permit a fair price comparison in related party transactions where a deduction is made pursuant to 19 U.S.C. § 1677a(e) for selling expenses generally incurred by the related importer in selling the merchandise in the United States, including items of general administrative and overhead expense that are not directly related to the sales involved. The calculation of dumping margins would be severely distorted if no offsetting adjustments were permitted in the calculation of foreign market value. In point of fact, a margin could be found simply because the foreign market value in question reflected the selling cost in the home market which the producer was absorbing. This unfairness is eliminated, in part, by the ESP offset since it prevents the imposition of antidumping duties solely as a result of the selling expenses incurred by the manufacturer in the home market. [Emphasis added.]

---

**4.** As previously noted, in *Smith Corona* the offset *cap* was not challenged by Silver. Rather, it was the validity of the offset itself that was challenged by appellant (intervenor here).

As underscored above, unfairness is eliminated only "in part" by the capped ESP offset. Obviously, application of the cap thwarts a fair comparison of "apples with apples" to the extent that fixed selling expenses must be deducted from the United States price (19 U.S.C. § 1677a(e)(2)), but deduction of similar selling expenses in the home market is arbitrarily limited.[5] Inasmuch as Congress stipulated the deduction of all selling expenses from the United States price, undoubtedly the intent was that the same treatment be accorded foreign market value to achieve the objective of a fair comparison of "apples with apples". In view of that clear statutory objective, the administering authority acted arbitrarily and beyond its authority in capping the offset as prescribed by 19 CFR § 353.15(c).

With reference to the ESP offset itself, the Appellate Court held in *Smith Corona* that the Secretary's interpretation was not entitled to deference by virtue of either long-standing application of the regulation or legislative acquiescence. Just as with the offset itself, the *cap* lacks Congressional approval and is due no special deference.[6] Hence, the validity of the cap, like the validity of the offset concept itself, must be judged on the basis of whether the cap comports with the underlying statutory scheme for an efficient and fair comparison of prices in two markets. This, in essence, was the CAFC's rationale in *Smith Corona* sustaining the validity of the offset regulation, *so far as the regulation was challenged there.* Here, therefore, I conclude that the cap now challenged by Silver does not comport with the underlying statutory objective of an efficient and fair comparison of prices in two markets, and therefore the cap is invalid.

Accordingly, Silver's claim that in determining the foreign market value, ITA erred in limiting the deduction of home market selling expenses to the amount of selling expenses incurred in the United States is sustained. Under these circumstances, the appropriate remedy is to remand this case to ITA for a redetermination of foreign market value without the limitation imposed by the ESP offset cap.

### Difference in Levels of Trade

■ The second alleged error in ITA's LTFV determination is plaintiffs' claim for an adjustment to foreign market value for differences in circumstances of sale predicated upon the difference in the levels of trade to which Silver sold in the home market and in the United States market. Specifically, Silver asserts that in the home market it sold exclusively to retailers while in the United States market it sold only to wholesalers; and that ITA erroneously compared Silver's weighted average home market prices to large retail customers with the sales prices to wholesalers in the United States. Silver contends that ITA erred in denying Silver's claimed adjustment solely on the basis of a comparison of the quantities involved in the sales in the two markets.

19 CFR § 353.19, which concerns "level of trade", is among the regulations dealing with differences in circumstances of sale for which an adjustment to foreign market value may be allowed. That regulation reads:

> The comparison of the United States price with the applicable price in the market of the country of exportation (or, as the case may be, the price to or in third country markets) generally will be made at the same commercial level of trade. However, if it is found that the sales of

---

**5.** The ESP offset is a "special rule" permitting an adjustment to foreign market value for indirect selling expenses in ESP situations. 19 CFR § 353.15(c). In *Smith Corona,* the Court remarked that the ESP offset is neither based upon "directly related costs, nor is it based on *differences* in the circumstances of sale but, rather, on similarities". 713 F.2d at 1579 (emphasis in original).

**6.** As aptly noted by Judge Smith, the ESP offset regulation was not endorsed by Congress in connection with the enactment of the Trade Agreements Act of 1979, and was not adopted contemporaneously with the enactment of a statute. *Smith Corona,* 713 F.2d at 1579.

the merchandise to the United States or in the applicable foreign market at the same commercial level of trade are insufficient in number to permit an adequate comparison, the comparison will be made at the nearest comparable commercial level of trade and appropriate adjustments will be made for differences affecting price comparability.[7]

From ITA's notice in the Federal Register announcing its LTFV determination, it appears that ITA found Silver's claimed adjustment for the alleged difference in levels of trade "unwarranted" since in both the home and United States markets sales were made to "large wholesale quantity customers". (45 Fed.Reg. 18418). Thus, ITA did not dispute that Silver sold to retailers in the home market and to wholesalers in the United States, but apparently ITA disregarded Silver's evidence respecting the extra expenses involved in sales to retailers as opposed to wholesalers.

As noted above in connection with the ESP offset, a vital objective of the antidumping law is a fair comparison of prices. The level of trade adjustment, as authorized by 19 U.S.C. § 1677b(a)(4)(B) and prescribed by 19 CFR § 353.19, recognizes that separate and apart from adjustments for differences in the wholesale quantities sold (19 U.S.C. § 1677b(a)(4)(A) and 19 CFR § 353.14), sales at different levels of trade may not be comparable without appropriate adjustments. Frequently, of course, the level of trade will *correlate* with the quantity involved in the sales since retailers normally purchase in smaller quantities than wholesalers, but this is not necessarily true in every case. Ostensibly, ITA's response to Silver's claim for a level of trade adjustment ignored the distinction in the antidumping law between an adjustment related to differences in quantities sold and an adjustment predicated upon "other dif-

ferences in circumstances of sale", *viz.*, level of trade. Consequently, as previously mentioned, ITA rejected Silver's claim for a level of trade adjustment after finding that Silver's customers in both the home market and in the United States purchased PETs in "large wholesale quantities".

Under 19 CFR § 353.19, ITA must make an adjustment for different levels of trade where such difference affects "price comparability". Since in its LTFV determination, ITA concluded that no level of trade adjustment was warranted, ITA did not reach the question of whether Silver satisfactorily quantified its claimed level of trade adjustment on the basis of the extra expenses involved in selling to retailers in the home market as opposed to wholesalers. It is now settled that adjustments for differences in circumstances of sale may be quantified primarily on the basis of cost differentials, although ITA may also consider the effect of the differences on value. *See Smith Corona*, 713 F.2d at 1575–77.

Since the quantities sold in the two markets compared were not determinative of whether or not a level of trade adjustment should have been granted to Silver, the case must be remanded to ITA. On remand, ITA shall determine whether the expense data submitted by Silver satisfactorily supports a finding that the different levels of trade in the home market and in the United States affected price comparability; and ITA shall determine whether Silver adequately quantified its claimed adjustment predicated upon its proof of higher expenses in selling to retailers in the home market rather than to wholesalers.[8]

*Home Market Sales as Basis for Determining Foreign Market Value*

We turn to consideration of Silver's claim that ITA erroneously utilized home market

---

**7.** Authority for the foregoing regulation lies in the statutory provision requiring adjustments to foreign market value for "other differences in circumstances of sale". 19 U.S.C. § 1677b(a)(4)(B).

**8.** Plaintiffs vigorously dispute that the home market sales were in "large wholesale quanti-

ties". Even assuming that the home market sales were properly characterized by ITA as "wholesale quantities", such quantities clearly were not "large" relative to the wholesale quantities involved in sales to the United States market.

sales for computation of foreign market value because the volume of home market sales was insufficient to form an adequate basis of comparison with sales to the United States. Silver urges that constructed value was a proper basis for determining foreign market value.

Pertinent to the issue presented is 19 U.S.C. § 1677b(a)(1)(B) which provides:

(1) *In general.* The foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States—

\* \* \* \* \* \*

(B) \* \* \* or if the administering authority determines that the quantity sold for home consumption is so small *in relation to the quantity sold for exportation to countries other than the United States* as to form an inadequate basis for comparison, then the price at which so sold or offered for sale for exportation to countries other than the United States, \* \* \* [Emphasis added.]

And moreover, 19 CFR § 353.4 reads:

(a) *In general.* If it is established, in a situation other than that provided for in § 353.9, that during the representative period chosen for investigation the quantity of such or similar merchandise sold for consumption in the country of exportation is so small *in relation to the quantity sold for exportation to countries other than the United States (normally, less than five percent of the amount sold to third countries)* as to be an inadequate basis for determining the foreign market value of the merchandise imported into the United States, the foreign market value of the imported merchandise shall be determined either by reference to the price at which such or similar merchandise is sold or offered for sale for exportation to countries other than the United States or by reference to its constructed value. [Emphasis added.]

During the period of investigation, Silver Seiko sold 2,504 units in Japan, 26,611 units for export to third countries, and 88,100 units in the United States. Commerce found that home market sales constituted 8.6% of total sales to third countries other than the United States.[9] Accordingly, following its regulation, ITA used sales in the home market as the basis for determining foreign market value.

■ Grounded upon 19 U.S.C. § 1677b(a)(1)(B) and 19 CFR § 353.4, I conclude that ITA correctly based its determination of foreign market value on home market sales. Silver's arguments to the contrary, predicated upon the limited market in Japan for Roman character PETs, the legislative history of the Antidumping Act of 1921 and administrative practice are without merit for the following reasons:

■ First, in support of its contention that ITA abused its discretion in applying the five percent market test in this case, as set forth in 19 CFR § 353.4, *supra,* Silver relies upon the "extremely limited" market in Japan for Roman character PETs and their relatively expensive per-unit selling and distribution costs (as compared with United States sales). However, market size and the amount of the per-unit selling and distribution costs are irrelevant factors for purposes of determining the basis (i.e., home market sales, third country sales, or constructed value) used in an LTFV determination.

Second, plaintiffs argue that the "original" Congressional intent in enacting the Antidumping Act of 1921 (predecessor to the current antidumping law) was to counteract only predatory or "profitable" dumping,[10] and therefore the size of the foreign market must be sufficiently large so that profits from home market sales will support unfair (low) pricing policies in the United States. The short answer to the foregoing argument is that one may search

---

**9.** Home market sales constituted 2.8% of United States sales.

**10.** In such dumping, according to plaintiffs, a foreign manufacturer could, through highly

profitable sales in the home (or another) market, engage in low-priced sales to the United States to injure United States producers.

the antidumping law in vain for any suggestion that in determining foreign market value the administering authority must ascertain whether the exporter's home market or third country sales are sufficiently profitable to "support" the prices in the United States.

Finally, an examination of the administrative decisions cited by the parties fails to reveal a consistent administrative practice in determining the adequacy of home market sales by comparison with sales in the United States.

### Delivery Costs from Silver Seiko's Factory to its Central Warehouse

Silver Seiko, during the period of the LTFV investigation, manufactured typewriters at factories located in Kodaira and Kashiwazaki, Japan. The company's central warehouse, from which deliveries to all home market customers were made, abuts the factory at Kodaira. Because of limited storage facilities at its Kashiwazaki factory, all typewriters manufactured there by Silver Seiko were shipped to the Kodaira warehouse for storage pending sale and delivery to customers.

In its LTFV determination, ITA adjusted Silver Seiko's home market prices (which formed the basis for foreign market value) for delivery costs from the Kodaira warehouse to home market customers. However, ITA refused Silver's request for an adjustment of home market prices reflecting the expenses of delivery from the factory at Kashiwazaki to the central warehouse at Kodaira. ITA disallowed the requested adjustment on the ground that the delivery costs were an overhead expense and "not shown to be an expense directly related to

the sales under consideration". 45 Fed. Reg. 18418. In essence, ITA regarded the claim for the Kashiwazaki delivery costs as an adjustment for differences in circumstances of sale, and rejected the claimed expenses because they were not "directly related" to the sales of the merchandise in question. *See* 19 CFR § 353.15(a).

■ It is now established that there may be a circumstance of sale adjustment for inland freight charges incurred in the home market and for export to the United States. *Brother Industries, Ltd.,* 3 C.I.T. at 144–146, 540 F.Supp. at 1359–61. But certainly, adjustments for differences in circumstances of sale must be directly related to the sales under consideration. *Smith Corona, supra.*

■ I agree with the arguments of defendant and intervenor that the costs incurred by Silver Seiko in delivering unsold typewriters from its Kashiwazaki factory to its central storage warehouse at Kodaira are general overhead costs that were incurred irrespective of particular home market sales, and hence, were not directly related to the sales under consideration. Accordingly, the claimed adjustment for delivery costs from the factory to the central warehouse was properly disallowed by ITA.[11]

Silver's argument that the delivery costs from the factory to the warehouse were deductible from the sales price because the typewriters were merely "stored for a period of time in a central warehouse while en-route to the customer" must be rejected.[12] This theory stretches the parameters of Silver's *modus operandi* because the

11. Even assuming that the freight costs from the factory to the Kodaira warehouse were "directly related" to the number of units *shipped* to the central warehouse, this fact does not establish any "direct relationship" to the later *sales* of the typewriters in the home market. For purposes of 19 CFR § 353.15(a), there must be a direct relationship between the delivery costs and *sales* under consideration rather than a direct relationship between such costs and a number of units *shipped* to a central storage warehouse.

12. As correctly argued by intervenor, if a factory were in a building with a floor or space therein allocated to storage of inventory, there could be no doubt that the cost of transferring merchandise from the manufacturing floor to the storage floor would be a general overhead expense and would not be deductible as a delivery expense directly related to sales. The same result would follow if the manufacturing and storage facilities were in abutting buildings or in separate facilities.

typewriters delivered to the Kodaira warehouse were not sold goods "en-route" to a particular customer, but rather they were inventory awaiting sale. In sum, as found by ITA, the expenses of delivery to the central warehouse were general overhead expenses and not delivery costs directly related to particular sales.

In support of its claimed adjustment for delivery costs, Silver points out that in connection with export sales ITA deducted the cost of transporting the typewriters from the Kashiwazaki factory to the port of exportation (Yokohama) where they were warehoused pending shipment. Silver claims, therefore, that "it is obvious that the home market sale and export sale are not being compared on the same terms" (Brief, at 80). On this aspect of the matter, I agree with defendant and intervenor that there is a valid distinction between the cost of delivering merchandise to the manufacturer's central warehouse for storage pending sale and the cost incurred in the delivery of sold merchandise to a shipping warehouse at the port of embarkation prior to loading aboard a vessel. In the former case, the delivery expenses are general overhead costs unrelated to any particular sales, while in the latter situation the costs are directly related to the particular sales for export.

### Conclusion

In summary, for the reasons expressed herein, I find:

(1) Commerce erred in limiting the deduction of home market selling expenses in Japan to the amount of selling expenses incurred in the United States as prescribed by the exporter's sales price offset cap in 19 CFR § 353.15(c);

(2) Commerce erred in comparing prices in the home market with prices in the United States on the basis of sales to "customers who bought in large wholesale quantities", and in concluding that no adjustment for different levels of trade was warranted;

(3) Commerce correctly determined the foreign market value on the basis of home market sales without regard to a comparison of the size of the home market with the United States market; and

(4) Commerce correctly disallowed an adjustment for delivery costs from the factory to a central warehouse since such costs were a general overhead expense and not directly related to the sales under consideration.

Accordingly, it is hereby ORDERED:

1. This action is remanded to ITA for redetermination of foreign market value in accordance with this opinion, without limiting the deduction of home market selling expenses in Japan to the amount of the selling expenses incurred in the United States. Thus, in its redetermination ITA shall disregard the limitation on the exporter's sales price offset prescribed by 19 CFR § 353.15(c).

2. This action is also remanded to ITA for reconsideration of plaintiffs' claim for a level of trade adjustment. In this connection, ITA shall determine whether the expense data submitted by plaintiffs satisfactorily supports a finding that different levels of trade in the home market and in the United States affected price comparability; and ITA shall determine whether plaintiffs adequately quantified their claimed adjustment predicated upon proof of higher expenses in selling to retailers in the home market rather than to wholesalers.

3. ITA's determination and order are affirmed with respect to its use of home market sales, as opposed to constructed value as urged by plaintiffs, in determining the foreign market value of the subject PETs.

4. ITA's determination and order are also affirmed with respect to its disallowance of plaintiffs' claimed adjustment for delivery costs from the factory to the central warehouse.

5. The cross-claims of defendant and intervenor are, therefore, sustained to the

extent indicated in paragraphs 3 and 4 *supra*.

6. Within thirty days of the service of this order: ITA shall consider the matters specified in paragraphs 1 and 2, above, and shall publish in the Federal Register its new LTFV determination and antidumping duty order respecting PETs from Japan; and certified copies of the new LTFV determination and antidumping duty order shall be transmitted to the Clerk of the United States Court of International Trade and shall also be served upon plaintiffs.