**SAWHILL TUBULAR DIV. CYCLOPS CORP., Atcor, Inc., and Wheatland Tube Corp., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**Tata Iron & Steel Co., Ltd., Defendant-Intervenor.**

**Court No. 86–05–00574.**

United States Court of International Trade.

July 13, 1987.

Schagrin Associates, (Paul W. Jameson, Washington, D.C., on the motion), for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch (A. David Lafer, Washington, D.C., on the motion), for defendant.

Kaplan Russin & Vecchi (Dennis James, Jr. and Kathleen F. Patterson, Washington, D.C., on the motion), for defendant-intervenor.

**MEMORANDUM OPINION**

CARMAN, Judge:

By a motion for judgment upon the agency record under Rule 56.1 of the Rules of this Court, plaintiffs challenge the final affirmative determination of the International Trade Administration (ITA or Com-

merce) in *Certain Welded Carbon Steel Standard Pipe and Tube From India; Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 9089 (March 17, 1986). Plaintiffs contest that part of the final determination which found that welded carbon steel pipe and tube (pipe and tube or standard pipe and tube) produced by Tata Iron and Steel Tubes Ltd. (TISCO) were being sold in the United States below fair market value, and that the estimated weighted average dumping margin was 7.08%.

Plaintiffs contend the ITA's decision to deduct from foreign market value (FMV) an export rebate in the amount of the difference between the cost of steel in India and the international price of steel as a circumstance of sale under 19 U.S.C. § 1677b(a)(4)(B) was not in accordance with law. By contrast, the defendant contends the ITA's adjustment was correct since the export payment effectively reduced TISCO's export related costs and was directly related to TISCO's pipe and tube sales in the United States.

This Court holds the ITA's determination to make a circumstances of sale adjustment to FMV under § 1677b(a)(4)(B) in the amount of the export rebate paid to TISCO was reasonable since it was consistent with a reasonable interpretation of the circumstances of sale provision.

## FACTS

On July 16, 1985, the Standard Pipe and Tube Subcommittee of the Committee on Pipe and Tube Imports and each of the member companies who produce standard pipe and tube filed a petition with the ITA and the International Trade Commission (ITC). The petitioners alleged that imports of standard pipe and tube were being sold in the United States at less than fair value causing material injury to the domestic pipe and tube industry.

The ITA determined the petition contained sufficient grounds upon which to initiate an antidumping duty investigation. The ITA thereupon notified the ITC which determined there was a reasonable indication that imports of standard pipe and tube were materially injuring, or threatening material injury, to a U.S. industry. *See Certain Welded Carbon Steel Pipes and Tubes From India, Taiwan, Turkey, and Yugoslavia; Determinations,* 50 Fed.Reg. 37068 (Sept. 11, 1985).

During the course of the investigation, TISCO made various claims for an adjustment for the export payments received under the International Price Reimbursement Scheme (IPRS).[1]

In its affirmative preliminary determination, the ITA denied any adjustment to FMV for the IPRS. TISCO was found to have a dumping margin of 50.37%. *Certain Welded Carbon Steel Standard Pipe and Tube From India; Preliminary Determination of Sales at Less Than Fair Value,* 50 Fed.Reg. 53356 (Dec. 31, 1985).

During verification, the ITA determined that the IPRS payment was paid only to Indian manufacturers of pipe and tube that used domestically produced steel in the manufacture of their exported products. If the companies used imported steel or failed to export the pipe and tube, no payments were received. The IPRS payment is equal to the difference between the domestic price and the government-determined international price of steel. *See* Record at 882–83.

The ITA also verified that domestic steel prices are established by the Joint Planning Committee (JPC). Funding for the IPRS payment is provided by the Engineering Goods Exports Assistance Fund (EGEAF). The JPC price of steel includes a levy for the EGEAF. *Id.*

In the final determination, the ITA reduced FMV by the amount of the IPRS

---

1. In its questionnaire response, TISCO claimed that the IPRS was an "uncollected or rebated tax and duty." Record at 227. TISCO then contended that the IPRS is comparable to an import duty drawback. Record at 507. Later TISCO argued that FMV should be reduced by the IPRS since it is a difference in material cost. Record at 600–01. Prior to the date of the preliminary determination, TISCO claimed that the IPRS export payment was a circumstance of sale which should be used to reduce FMV in accordance with § 1677b(a)(4)(B).

payment as a circumstances of sale adjustment under § 1677b(a)(4)(B). TISCO was found to have a dumping margin of 7.0–8%. Petitioners commented upon the adjustment, and the ITA responded as follows:

*Comment 1:* Petitioners argue that the Department should not make a circumstances of sale adjustment to TISCO's home market sales price for the International Price Reimbursement Scheme (IPRS) because (1) the program might be countervailable; or (2) the program is not comparable to any situation in which circumstance of sale adjustments ordinarily are allowed; or (3) the program is merely an institutionalized cover for dumping because TISCO both pays into and receives rebates from the program.

*DOC Response:* We disagree. First, the countervailability of the IPRS should be addressed in the context of a countervailing duty investigation. Here, we are determining whether the IPRS meets the requirements for a difference in circumstances of sale adjustment, as provided for in the law and § 353.15 of the Commerce Regulations. Secondly, in this case, the IPRS rebate is directly related to, and in fact contingent upon, the export sale of the merchandise under investigation. Receipt of the IPRS effectively enhanced the net return to TISCO on those sales. Therefore, we believe this adjustment is comparable to other circumstances of sale adjustments.

Third, although TISCO pays required levies into and receives payments from the Engineering Goods Exports Assistance Fund (EGEAF), it does so according to the rates established by the Indian government. Monies for this generalized fund come from assessments included in the government-set price of steel. The formula for rebates is tied to the difference between domestically-produced and internationally-acquired steel prices. As such, the fact that this rebate acts as a revenue enhancement for TISCO does not constitute dumping.

51 Fed.Reg. at 9091.

## BACKGROUND

The antidumping law provides for the imposition of antidumping duties when imported merchandise is sold or is likely to be sold in the United States at less than fair value. In general, it must also be determined that an industry in the United States is being or is likely to be injured or prevented from being established as a result of these sales. 19 U.S.C. § 1673.

In general terms, merchandise is sold at less than fair value when the purchase price or the exporter's sales price is less than its FMV. FMV is defined to include the price of the merchandise, at the time of exportation to the United States, at which such or similar merchandise is sold or offered for sale in the home market in the usual wholesale quantities and in the ordinary course of trade. 19 U.S.C. § 1677b(a).[2]

When it is established to the satisfaction of the administering authority that the amount of the difference between the USP and the FMV is wholly or partially attributable to other differences in the circumstances of sale, an adjustment to FMV is appropriate. The statutory authority for adjustment provides as follows:

(4) *Other adjustments.*—In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to—

. . . .

(B) other differences in circumstances of sale; or

. . . .

---

**2.** Although fair value is usually determined by the exporter's comparable home price, in appropriate circumstances, the exporter's price in a third country market or the constructed value of the merchandise may be used. *See* § 1677b(a).

then due allowance shall be made therefor.

19 U.S.C. § 1677b(a)(4)(B).[3] The Commerce regulation governing the circumstances of sale adjustment provides in pertinent part as follows:

§ 353.15 Differences in circumstances of sale.

(a) *In general.* In comparing the United States price with the sales, or other criteria applicable, on which a determination of foreign market value is to be based, reasonable allowances will be made for bona fide differences in the circumstances of the sales compared to the extent that it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration.

(b) *Examples.* Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms, guarantees, warranties, technical assistance, servicing, and assumption by a seller of a purchaser's advertising or other selling costs. Reasonable allowances also generally will be made for differences in commissions. Allowances generally will not be made for differences in advertising and other selling costs of a seller, unless such costs are attributable to a later sale of the merchandise by a purchaser.

. . . .

(d) *Determination of allowances.* In determining the amount of the reasonable allowances for any differences in circumstances of sale, the Secretary will be guided primarily by the cost of such differences to the seller, but, where appropriate, he may also consider the effect of such differences upon the market value of the merchandise.

19 C.F.R. § 353.15.

## DISCUSSION

The question presented for decision is whether or not the ITA acted in accordance with law when it reduced FMV, as a circumstance of sale pursuant to § 1677b(a)(4)(B), in the amount of the IPRS export payment received by Indian exporters of standard pipe and tube. Plaintiffs' basic position is that the IPRS rebate is not within the class of situations that the statute, regulations, and legislative history indicate constitute circumstances of sale.

In reviewing this determination, the Court is guided primarily by § 1516a(b)(1)(B) which provides that the Court shall hold unlawful any determination found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." Plaintiff contends that the ITA's interpretation of § 1677b(a)(4)(B) as implemented by 19 C.F.R. § 353.15 does not support the ITA's determination to adjust FMV by the amount of the export payment.

At the outset, it should be noted that an agency's interpretation of a statute it is charged with administering is entitled to some measure of deference. Furthermore, in determining the validity of a regulation adopted by the agency, the relevant inquiry is whether or not the regulation is a proper exercise of authority and is reasonable. *Smith-Corona Group v. United States,* 713 F.2d 1568, 1575 (Fed Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

The circumstances of sale adjustment first appeared in a 1955 Treasury regulation which authorized the agency to make reasonable allowance for circumstances of sale. *See* T.D. 53773 (April 8, 1955), 19 C.F.R. § 14.7(b)(1). Statutory authority for

---

**3.** Additional support for this adjustment is provided by Article VI of the General Agreement on Tariffs and Trade (GATT) which specifies that "[d]ue allowance shall be made in each case for differences in conditions and terms of sales, for differences in taxation, and for *other differences affecting price comparability.*" General Agreement on Tariffs and Trade, *opened for acceptance* Oct. 30, 1947, art. VI(1)(b), 61 Stat. A3, A23, 4 Bevans 639, 55 U.N.T.S. 194. (emphasis added).

the adjustment followed in the 1958 amendments to the Antidumping Act. The House and Senate Reports provided as examples of the adjustment differences in terms of sale, credit terms, and advertising and selling costs. H.R.Rep. No. 1261, 85th Cong., 1st Sess. 7 (1957); S.Rep. No. 1619, 85th Cong., 2d Sess. 7 (1958).

In 1960, in order to curb the potential for abuse, the regulations were amended to limit the situations in which circumstances of sale adjustments could be granted. Treasury instituted a directly related test in the circumstances of sale provision. The revised regulation provided as follows:

(2) *Circumstances of sale.*—In comparing the purchase price or exporter's sales price, as the case may be, with the sales, or other criteria applicable, on which determination of fair value is to be based, reasonable allowances will be made for bona fide differences in circumstances of sale if it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences.

*Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a reasonably direct relationship to the sales which are under consideration.* Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms, guarantees, warranties, technical assistance, servicing, and assumption by a seller of a purchaser's advertising or other selling costs. Reasonable allowances will also generally be made for differences in commissions. Except in those instances where it is clearly established that the differences in circumstances of sale bear a reasonably direct relationship to the sales which are under consideration, allowances generally will not be made for differences in research and development costs, production costs, and advertising and other selling costs of a seller unless such costs are

attributable to a later sale of merchandise by a purchaser; provided that reasonable allowances for selling expenses generally will be made in cases where a reasonable allowance is made for commissions in one of the markets under consideration and no commission is paid in the other market under consideration, the amount of such allowance being limited to the actual selling expense incurred in the one market or the total amount of the commission allowed in such other market, whichever is less.

In determining the amount of the reasonable allowances for any differences in circumstances of sale, the Secretary will be guided primarily by the effect of such differences upon the market value of the merchandise but, where appropriate, may also consider the cost of such differences to the seller, as contributing to an estimate of market value.

T.D. 55118 (April 29, 1960) (emphasis added); 19 C.F.R. § 14.7(b)(2).

Suffice it to say that in the current regulation, the term "reasonably" has been deleted from the direct relationship test. The amended regulation also omits reference to production and research and development costs. *See* 19 C.F.R. § 353.15.

From this, plaintiff contends that the examples of circumstances of sale provided in the regulations and legislative history in accordance with the statutory construction maxim *ejusdem generis*[4] indicate that the difference must be a difference in selling expenses. According to the plaintiff, the idea is that some sort of service has been provided. Since the IPRS payment is neither a selling expense nor a service, plaintiff contends an adjustment to FMV was inappropriate. Plaintiff further contends that the purpose of the antidumping law is to remedy situations in which a foreign producer uses an unfair price to gain entry into and increase sales in the United States, thereby injuring a domestic industry.

---

4. The *ejusdem generis* rule provides that where general words follow an enumeration of words of a specific meaning, the general words should apply only to things of the same kind or class of those things specifically mentioned. Black's Law Dictionary 464 (5th ed. 1979).

In *Rucker v. Wabash Railroad Company*, 418 F.2d 146 (7th Cir.1969), plaintiffs commenced a diversity action against the defendant railroad company for personal injuries sustained by them at a railroad crossing. Plaintiffs alleged, *inter alia,* that the defendant had maintained freight cars on its tracks that constituted "unnecessary obstructions" obscuring the view of oncoming trains to highway travelers in violation of a state statute and its implementing regulations. At the close of the evidence, the trial court directed verdict for the defendant apparently on the ground that the phrase "other unnecessary objects" in the regulations, in accordance with *ejusdem generis,* referred to permanent vegetation obstructions, such as brush, shrubbery, trees, etc., but not to movable freight cars.

On appeal, the defendant railroad company argued that the phrase "other unnecessary objects" in the regulations was limited to natural objects. While holding that *ejusdem generis* is applicable in the context of administrative regulations, the *Rucker* court recognized the limitations of the doctrine when it stated:

> When properly applied, the rule of *ejusdem generis* is a useful canon of construction. But it is to be resorted to not to obscure and defeat the intent and purpose of [the enacting body], but to elucidate its words and effectuate its intent. It cannot be employed to render general words meaningless.

*Rucker,* 418 F.2d at 150 (quoting *Mason v. United States,* 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396 (1923)). *See also* 2A N. Singer, Sutherland Stat. Const., § 47.22, (4th ed. 1979) ("the general words are not restricted in meaning to objects of the same kind ... if there is a clear manifestation of contrary intent").

The *Rucker* court then held that the intent of the agency and the legislature was to place an affirmative duty upon railroads to preserve visibility for highway travelers approaching crossings. As such, the *Rucker* court rejected the narrow construction urged by the defendant in accordance with

*ejusdem generis.* The court reached this conclusion despite relevant language in the statute suggesting that "other unnecessary obstructions" pertained to natural objects.

In the same vein, this Court declines to adopt on the basis of *ejusdem generis* a narrow construction of the circumstances of sale provision. Section 1677b(a)(4)(B) was designed to facilitate a fair and efficient comparison between foreign market value and price in the United States market. *F.W. Myers & Co., Inc. v. United States,* 72 Cust.Ct. 219, C.D. 4544, 376 F.Supp. 860 (1974). It is also clear that Congress has deferred to the expertise of the agency and vested broad discretion in it to make adjustments for the differences in the circumstances of sale. *Smith-Corona Group v. United States,* 713 F.2d 1568, 1575 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). One recognized limitation upon this power is that adjustment be made for those factors and conditions which have a direct bearing on or relationship to the sales under consideration. As this Court has aptly stated:

> although the cost factors might vary considerably in each case, depending upon the kind of merchandise involved, the sales and marketing practices, and other conditions, all would have one common element—a reasonably direct effect upon the sales under scrutiny.

*F.W. Myers,* 72 Cust.Ct. at 233, 376 F.Supp. at 872. *See also Silver Reed America, Inc. v. United States,* 7 CIT 23, 581 F.Supp. 1290 (1984), *rev'd on other grounds,* 753 F.2d 1033 (Fed.Cir.1985) (circumstances of sale adjustment not allowed because costs incurred by manufacturer in delivering unsold typewriters from its factory to its central storage warehouse were not directly related to the sales under consideration). Review of the ITA's findings in this case clearly shows the ITA recognized this limitation when it determined that the IPRS rebate is "directly related to, and in fact contingent upon, the export sale

of the merchandise under investigation." 51 Fed.Reg. at 9091.[5]

The agency is empowered to make an adjustment to FMV for the differences in costs that affect prices. In *Smith-Corona*, the Court of Appeals stated that the antidumping law is designed to remedy the situation in which "foreign merchandise is sold or is likely to be sold in the United States at less than *fair value* to the material injury of a United States industry." 713 F.2d 1568, 1571. While the Court stated that antidumping duties are imposed on the basis of differences in value, not differences in cost, the *Smith-Corona* Court upheld 19 C.F.R. § 353.15(d) which establishes a preference for cost in determining the amount of adjustment for differences in the circumstances of sale. The Court further added that "absent evidence that costs do not reflect value, the Secretary may reasonably conclude that cost and value are directly related." 713 F.2d at 1577, n. 26. *See also Atlantic Steel Co. v. United States,* 10 CIT ——, 636 F.Supp 917 (1986) (citing 19 CFR § 353.15(d) and holding that the ITA is not required to show that a difference in cost affect price in the home market for an adjustment under the circumstances of sale provision).

Plaintiff nevertheless contends that the ITA may not make an adjustment for every difference in cost. Plaintiff argues, for example, that there are instances in which a foreign producer can prove that its home market product costs more to produce than the comparable United States product. Citing 19 C.F.R. § 353.16, plaintiff contends in such a situation, the ITA does not grant an adjustment. This example, however, proves little since the regulation cited explicitly provides that differences in costs of producing merchandise with identical physical characteristics as end products will not be considered appropriate adjustments. There is no comparable limitation in 19 C.F.R. § 353.15.

**5.** Plaintiff also contends the ITA has devised a new criterion for determining whether or not a particular event constitutes a circumstances of sale adjustment—does it "effectively enhance the net return" on the sales in question? The Court finds, however, that the use by the ITA of this language is not materially significant since

Plaintiff contends that the export rebate is simply a straight export subsidy. As such, the plaintiff reasons, it would be unprecedented and very bad policy, in contravention of the purposes of the antidumping law, to reward exporters in a dumping investigation for having received a countervailable subsidy. Plaintiff refers the Court to *Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 3384 (January 27, 1986), in which the ITA did not make an adjustment for that part of a rebate which exceeded the amount of indirect taxes actually incurred by the exported merchandise.

The *Thai* determination, however, is clearly distinguishable. In the antidumping duty investigation, the ITA already had the benefit of a finding that the amount of the rebate that exceeded indirect taxes and duties incurred was a countervailable subsidy. *See Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand,* 50 Fed.Reg. 32751 (August 14, 1985). Therefore, the ITA was not called upon to determine in the antidumping investigation whether or not the rebate was a countervailable subsidy. Indeed, such a determination would not have been permissible in light of this Court's decision in *Huffy Corp. v. United States,* 10 C.I.T. ——, 632 F.Supp. 50 (1986).

In the *Huffy* decision, this Court rejected the notion that the ITA should not have made an adjustment to the USP for an import duty rebate alleged to be a countervailable subsidy. According to the plaintiff in *Huffy*, Congress did not intend that countervailable subsidies be used to reduce dumping margins. At ——, 632 F.Supp. at 55. In support of its argument, plaintiff referred the Court to 19 U.S.C.

the ITA clearly followed the test being employed by it that differences in circumstances of sale for which allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales under consideration.

§ 1677a(d)(1)(C) which provides an adjustment for tax rebates only if the tax is imposed directly on the merchandise, that is, an "indirect" tax. As the Court of Customs and Patents Appeals had found, relief from indirect taxes did not amount to a countervailable subsidy; whereas, relief from direct taxes, that is, those imposed on the producer rather than on the merchandise is a countervailable subsidy (citing *American Express Co. v. United States*, 60 CCPA 86, C.A.D. 1087, 472 F.2d 1050 (1973)).

While agreeing that the legislative history of 19 U.S.C. § 1677a(d)(1)(C) indicates that Congress consciously intended that tax remissions constituting countervailable subsidies should not be used to reduce dumping margins, the *Huffy* Court went on to hold that the ITA should refrain from making a subsidy determination in the context of a dumping investigation. The Court provided the following rationale:

> The determination of whether a countervailable subsidy exists is a complex one and Congress has provided a separate set of guidelines for the inquiry. In a dumping investigation the ITA is not seeking the same information or asking the same questions it would in a countervailing duty investigation. For this Court to disallow an adjustment to third country price because the import duty rebate is allegedly a countervailable subsidy would be to bypass the countervailing duty statute and essentially penalize the Taiwanese exporters without allowing them an opportunity at the agency level to have a full hearing on whether the rebates are a subsidy.

*Huffy*, 10 CIT at ——–——, 632 F.Supp. at 55–56. The *Huffy* Court additionally found that the distinction between direct and indirect taxes was more easily made than the distinction between an import duty rebate that is or is not countervailable.

In line with the reasoning of *Huffy*, this Court holds that the distinction between direct and indirect taxes is more easily made than the distinction between an export payment that is or is not countervailable. Just as the *Huffy* Court held, the ITA properly refrained from making a subsidy determination in the context of its dumping investigation.

Furthermore, there are several cases which indicate how an export payment such as the IPRS should be treated when FMV is based upon constructed value rather than home market prices. In *United States v. European Trading Co.*, 27 CCPA 289, C.A.D. 103 (1940), a German producer of wire fish netting received a rebate upon exportation from the supplier of the principal input. The Court of Customs and Patents Appeals held that in calculating the cost of production, the amount of the rebate should not be added. The Court affirmed the lower court which held that even assuming the rebate was a subsidy, the proper cost was the producer's *actual cost*, with no addition for the rebate. *See also Al Tech Specialty Steel Corp. v. United States*, 10 CIT ——, 633 F.Supp. 1376 (1986) (Commerce's decision not to include subsidies in cost of production and constructed value calculations was reasonable).

Plaintiff nevertheless alleges that the granting of an adjustment for an export subsidy, in this case the IPRS, provides a double advantage to exporters. This argument, however, assumes that the IPRS is a countervailable subsidy. In light of the *Huffy* decision, such an assumption by the ITA is inappropriate. It would have been, in the words of the *Huffy* Court, "to bypass the countervailing duty statute and essentially penalize the [Indian] exporters without allowing them an opportunity at the agency level to have a full nearing on whether the rebates are a subsidy." 10 CIT at ——, 632 F.Supp. at 56.

Accordingly, plaintiffs' motion for judgment on the agency record is denied. The final affirmative determination of the ITA is hereby sustained.