The TORRINGTON COMPANY, Plaintiff,

Federal–Mogul Corporation,
Plaintiff–Intervenor,

v.

UNITED STATES, Defendant,

SKF USA Inc. and SKF GmbH; GMN Georg Muller Nurnberg AG; NTN Bearing Corporation of America and NTN Kugellagerfabrik (Deutschland) GmbH; Caterpillar Inc.; FAG Kugelfischer Georg Schaefer KGaA; INA Walzlager Schaeffler KG and INA Bearing Company, Inc.; Messerschmitt–Boelkow–Blohm, GmbH and MBB Helicopter Corporation, Defendant–Intervenors.

Court No. 91–08–00567.

United States Court of International Trade.

Aug. 20, 1993.

380

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Wesley K. Caine, Myron A. Brilliant, Geert De Prest, Margaret E.O. Edozien, Robert A. Weaver, David Scott Nance and Amy S. Dwyer, Washington, DC, for plaintiff The Torrington Co.

Frederick L. Ikenson, P.C., Frederick L. Ikenson, J. Eric Nissley and Joseph A. Perna, V, Washington, DC, for plaintiff-intervenor Federal–Mogul Corp.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Velta A. Melnbrencis and Jane E. Meehan; John D. McInerney, Acting Deputy Chief Counsel for Import Admin., Dean A. Pinkert, Stephen J. Claeys and Douglas S. Cohen, Attorney–Advisors, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, of counsel, for defendant.

Howrey & Simon, Herbert C. Shelley, Scott A. Scheele, Alice A. Kipel, Juliana M. Cofrancesco and Thomas Trendl, Washington, DC, for defendant-intervenors SKF USA Inc. and SKF GmbH.

Grunfeld, Desiderio, Lebowitz & Silverman, Bruce M. Mitchell and Philip S. Gallas, New York City, for defendant-intervenor GMN Georg Muller Nurnberg AG.

Barnes, Richardson & Colburn, Robert E. Burke, Donald J. Unger, Kazumune V. Kano

and Diane A. MacDonald, Chicago, IL, for defendant-intervenors NTN Bearing Corp. of America and NTN Kugellagerfabrik (Deutschland) GmbH.

Powell, Goldstein, Frazer & Murphy, Richard M. Belanger and Neil R. Ellis, Washington, DC, for defendant-intervenor Caterpillar Inc.

Grunfeld, Desiderio, Lebowitz & Silverman, Max F. Schutzman, David L. Simon, Andrew B. Schroth and Matthew L. Pascocello, New York City, for defendant-intervenor FAG Kugelfischer Georg Schafer KGaA.

Arent Fox Kintner Plotkin & Kahn, Stephen L. Gibson and Eleanor Pelta, Washington, DC, for defendant-intervenors INA Walzlager Schaeffler KG and INA Bearing Co., Inc.

Rogers & Wells, William Silverman and Ryan Trainer, Washington, DC, for defendant-intervenor Messerschmitt–Boelkow–Blohm GmbH and MMB Helicopter Corp.

### OPINION

TSOUCALAS, Judge:

Plaintiff, The Torrington Company ("Torrington"), moves pursuant to Rule 56.1 of the Rules of this Court for judgment on the agency record, challenging certain aspects of the Department of Commerce, International Trade Administration's ("ITA") final results in the first administrative review of imports of antifriction bearings from the Federal Republic of Germany. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany; Final Results of Antidumping Duty Administrative Review ("Final Results")*, 56 Fed.Reg. 31,692 (1991).

### Background

On June 11, 1990, the ITA initiated an administrative review of imports of ball bearings, cylindrical roller bearings, spherical plain bearings and parts thereof from the Federal Republic of Germany. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom Initiation of Antidumping Administrative Reviews,* 55 Fed. Reg. 23,575 (1990).

On March 15, 1991, the ITA published its preliminary determination in the administrative review. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews,* 56 Fed.Reg. 11,200 (1991).

On July 11, 1991, the ITA published its Final Results in this proceeding. *Final Results,* 56 Fed.Reg. 31,692.

Torrington moves pursuant to Rule 56.1 of the Rules of this Court for summary judgment on the agency record alleging that the following actions by the ITA were unsupported by substantial evidence on the administrative record and not in accordance with law: the ITA's (1) use of a methodology for adjusting United States price ("USP") and Foreign Market Value ("FMV") for Germany's value added tax ("VAT") that granted a circumstance of sale ("COS") adjustment to FMV to achieve tax neutrality; (2) method of calculating cash deposit rates for estimated duties; (3) in regard to exporter's sales price ("ESP") transactions, allowance of an adjustment to FMV for inventory carrying costs; (4) failure to verify FAG Kugelfischer Georg Schaefer KGaA's ("FAG") cost response; (5) failure to verify INA Walzlager Schaeffler KG's ("INA") cost response; (6) adjustment to FMV for SKF GmbH's ("SKF") pre-sale inland freight; (7) treatment of SKF's home market discounts; and (8) allowance of a COS adjustment for FAG's currency hedging expenses. *Memorandum in Support of Plaintiff The Torrington Company's Motion for Judgment on the Agency Record ("Torrington's Memorandum")* at 9–67.

### Discussion

This Court's jurisdiction over this matter is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

■ A final determination by the ITA in an administrative proceeding will be sustained unless that determination is "unsup-

ported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States*, 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

### 1. *Circumstance of Sale Adjustment to FMV for Value Added Tax*

Torrington challenges the ITA's use of a methodology for adjusting USP and FMV for Germany's VAT that granted a COS adjustment to FMV to achieve tax neutrality. *Torrington's Memorandum* at 31–33.

Defendant argues that its actions were supported by substantial evidence on the administrative record and otherwise in accordance with law. *Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Defendant's Memorandum")* at 12–38.

For a more detailed discussion of Torrington and defendant's arguments on this issue, see this Court's decision in *Torrington Co. v. United States*, 17 CIT ——, ——, 818 F.Supp. 1563, 1567–69 (1993).

SKF, FAG, INA, GMN Georg Muller Nurnberg AG ("GMN"), NTN Bearing Corporation of America and NTN Kugellagerfabrik (Deutschland) GmbH ("NTN") essentially agree with the defendant's arguments on this issue. *Opposition of SKF USA Inc. and SKF GmbH to Torrington's Motion for Judgment on the Agency Record ("SKF's Opposition")* at 4–8; *Memorandum of Defendant–Intervenor FAG Kugelfischer Georg Schaefer KGaA ("FAG") in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("FAG's Memorandum")* at 51–56; *Memorandum of INA Walzlager Schaeffler KG and INA Bearing Company, Inc. in Opposition to Plaintiff The Torrington Company's Motion for Judgment on the Agency Record ("INA's Memorandum")* at 11–14; *Memorandum of Defendant–Intervenor GMN Georg Muller Nurnberg AG ("GMN") in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record*

*("GMN's Memorandum")* at 23–28; *Response Brief of Defendant–Intervenor NTN Bearing Corporation of America and NTN Kugellagerfabrik (Deutschland) GmbH ("NTN's Brief")* at 8–19.

This Court has fully addressed these arguments and adheres to its decision on this issue in *Federal–Mogul Corp. v. United States*, 17 CIT ——, ——, 813 F.Supp. 856, 863–65 (1993). This Court remands this issue to the ITA to allow the ITA to add the full amount of VAT paid on home market sales to FMV without adjustment.

### 2. *Calculation of Cash Deposit Rates*

In this administrative review, the ITA used two different methodologies for the actual calculation of dumping margins in cases where ESP sales were used: one for assessing duties on entries covered by the review, and the other for setting the cash deposit rate on future entries of the subject merchandise. *Final Results*, 56 Fed.Reg. at 31,-693–95, 31,698–702. To calculate the assessment rate for ESP sales, the ITA "divide[d] the total PUDD [potential uncollected dumping duties—calculated as the total difference between foreign market value and U.S. price for an exporter] for the reviewed sales by the *total entered value* of those reviewed sales . . . ." *Final Results*, 56 Fed.Reg. at 31,698–99 (emphasis added). To calculate the estimated cash deposit rate for ESP sales, the ITA "divided the total PUDD for each exporter by the *total net U.S. price* for that exporter's sales . . . ." *Id.* at 31,699 (emphasis added).

Torrington argues that the ITA's use of a methodology which results in an estimated cash deposit rate different from the assessment duty rate was unsupported by substantial evidence on the record and not in accordance with law. *Torrington's Memorandum* at 64–67.

Defendant argues that its actions were supported by substantial evidence on the administrative record and otherwise in accordance with law. *Defendant's Memorandum* at 59–66. In addition, defendant argues that this issue is moot because of the publication of superseding cash deposit rates in *Antifric-*

*tion Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews,* 57 Fed.Reg. 28,360 (1992). *Defendant's Memorandum* at 57–59.

For a more detailed discussion of Torrington and defendant's arguments on this issue, see this Court's decision in *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1569.

SKF, FAG, INA, GMN and NTN essentially agree with the defendant's arguments on this issue. *SKF's Opposition* at 18–23; *FAG's Memorandum* at 73–85; *INA's Memorandum* at 15–17; *GMN's Memorandum* at 29–43; *NTN's Brief* at 27–30.

The Court agrees with the defendant that this issue is now moot. However, the Court directs the defendant to this Court's decision on this issue in *Federal–Mogul,* 17 CIT at ——, 813 F.Supp. at 866–68.

### 3. Inventory Carrying Costs

In the Final Results of this administrative review the ITA correctly adjusted ESP for imputed inventory carrying costs pursuant to 19 U.S.C. § 1677a(e)(2) (1988). Torrington does not challenge this adjustment.

Pursuant to its new administrative practice, the ITA also made a corresponding adjustment to FMV for imputed inventory carrying costs when comparing ESP sales to FMV sales.

Torrington objects to this adjustment by the ITA to FMV for imputed inventory carrying costs. *Torrington's Memorandum* at 34–40.

For a detailed discussion of Torrington and defendant's arguments on this issue, see this Court's decision in *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1574–77.

SKF, FAG, INA, GMN and NTN essentially agree with the defendant's arguments on this issue. *SKF's Opposition* at 8–12; *FAG's Memorandum* at 38–50; *INA's Memorandum* at 14–15; *GMN's Memorandum* at 10–22; *NTN's Brief* at 19–24.

This Court adheres to its decision on this issue in *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1576–77, and finds that the ITA's adjustment to FMV for imputed inventory carrying costs pursuant to 19 C.F.R. § 353.-56(b)(2) (1991) was a reasonable exercise of the ITA's discretion in implementing the antidumping duty statute and is affirmed.

### 4. Failure to Verify FAG's Cost Response

On October 5, 1990, Torrington requested the ITA to conduct verification of all responses submitted in this administrative review, including FAG's cost response, pursuant to 19 U.S.C. § 1677e(b) (1988) and 19 C.F.R. § 353.36 (1991).[1] Administrative Record Germany Public Document No. ("AR Ger. Pub.Doc. No.") 246. FAG had not yet submitted its cost response to the ITA. AR

---

1. 19 U.S.C. § 1677e(b) states in pertinent part:
   **(b) Verification**
   The administering authority shall verify all information relied upon in making—

   .    .    .    .    .

   (3) a review and determination under section 1675(a) of this title, if—
   (A) verification is timely requested by an interested party ..., and
   (B) no verification was made under this paragraph during the 2 immediately preceding reviews and determinations under that section of the same order, finding, or notice, *except that this clause shall not apply if good cause for verification is shown.*
   (Emphasis added).
   Since this was the first review of the outstanding antidumping duty order regarding antifriction bearings from Germany, the ITA was only required to conduct verification if timely requested by an interested party and only if good cause for verification was shown.

The relevant section of the ITA's regulations state:
**§ 353.36   Verification of information.**
   (a) *In general.*   (1) The Secretary will verify all factual information the Secretary relies on in:

   .    .    .    .    .

   (iv) The final results of an administrative review under § 353.22(c) or (f) if the Secretary decides that good cause for verification exist; and
   (v) The final results of an administrative review under § 353.22(c) if:
   (A) An interested party ... not later than 120 days after the date of publication of the notice of initiation of review, submits a written request for verification; and
   (B) The Secretary conducted no verification under this paragraph during either of the two immediately preceding administrative reviews.
19 C.F.R. § 353.36(a).

Ger. Pub. Doc. Nos. 271, 278, 286, 316, 361, 377, 408, 411, 412.

After FAG submitted its cost response, Torrington renewed its request for verification alleging that FAG's cost response was missing important information and that some of the information reported was inconsistent. AR Ger.Pub.Doc. No. 340.

In a letter dated January 25, 1991, Torrington refers to the ITA's decision to cancel verification of FAG's cost response, alleging that it was due in part to the outbreak of the Persian Gulf War, and goes on to request the ITA to reschedule the verification or conduct limited verification in Washington, D.C. AR Ger.Pub.Doc. No. 430. The ITA refused Torrington's request to reschedule verification or conduct limited verification in Washington, D.C.

Torrington argues that 19 U.S.C. § 1677e(b)(3)(B) requires the ITA to verify all information used in an administrative review "if good cause for verification is shown." Torrington cites to the House of Representatives Ways and Means Committee's report on the Trade Remedies Reform Act of 1984, which was later incorporated into the Trade and Tariff Act of 1984, for a definition of "good cause." The Report states that "[g]ood cause could be such factors as a significant issue of law or fact, changed or special circumstances, discrepancies found in previous verifications, or the likelihood of a significant impact on the result." H.R.Rep. No. 725, 98th Cong., 2d Sess. 43 (1984), U.S.Code Cong. & Admin.News 1984, pp. 4910, 5170. Torrington argues that anytime these or comparable circumstances are shown to exist verification is required. *Torrington's Memorandum* at 22–25.

Torrington argues that the analysis of FAG's cost response that it presented to the ITA showed that discrepancies in the response proved that good cause existed for verification of FAG's cost response. *Id.* at 9–16, 26–27. Torrington points out that FAG used a new cost accounting system to report costs for this administrative review and that the ITA has conducted verification in situations where a respondent used a new cost accounting system. *Id.* at 27 (*citing Final Determination of Sales at Less Than Fair Value: New Steel Rail, Except Light Rail, From Canada*, 54 Fed.Reg. 31,984 (1989)). Torrington argues that at a minimum the ITA should have conducted a modified form of verification of FAG's cost response in Washington, D.C. *Id.* at 29–30.

Defendant argues that Torrington failed to show that good cause for verification of FAG's cost response existed. Defendant argues that the ITA correctly requires more than mere speculation by a party requesting verification in order for the ITA to find that good cause for verification exists. Defendant argues that the ITA will not find good cause to verify if a request to verify is made prior to the submission of the data to be verified. Defendant also argues that the ITA will not find good cause to verify if the ITA finds that a respondent has addressed any perceived deficiencies in its responses and the party requesting verification has not shown that any remaining deficiencies will have an impact on dumping margins. *Defendant's Memorandum* at 4–6, 8–10.

Specifically, defendant argues that the ITA evaluated FAG's cost response, deficiency responses, its other responses and verified FAG's sales data including FAG's accounting systems and found the information submitted to be credible. Therefore, the ITA determined that there was no need to verify FAG's cost response. *Defendant's Memorandum* at 7–8.

Defendant also points out that Torrington failed to substantiate that any remaining problems with FAG's cost response would have a significant effect on FAG's dumping margin. *Id.* at 9–10.

Finally, defendant points out that the ITA did consider conducting limited verifications in Washington, D.C., but rejected the idea for logistical and procedural reasons. Defendant states that the biggest problem with conducting verifications in Washington was that the ITA could not rely on the veracity of documents submitted under such a procedure. *Id.* at 10–11.

FAG agrees with the defendant's arguments on this issue. *FAG's Memorandum* at 12–37.

In response to defendant, Torrington argues that the fact that the ITA originally scheduled verification of FAG's cost response, but canceled it at least in part due to the outbreak of the Persian Gulf War, supports Torrington's contention that good cause for verification existed. *Reply of The Torrington Company, Plaintiff, to Responses of Defendant and Defendant–Intervenors to Torrington's Motion for Judgment Pursuant to Rule 56.1 ("Torrington's Reply")* at 27–28.

Torrington points out that the defendant's argument that Torrington's request for verification was invalid because it was filed prior to the submission of FAG's response data is misplaced because Torrington was required by 19 C.F.R. § 353.36(a)(v)(A) to request verification within 120 days of the initiation of review, which means the request had to be filed no later than October 9, 1990. FAG's cost response was filed on October 18, 1990. *Torrington's Reply* at 28–29; *see* AR Ger. Pub.Doc. No. 271.

Further, Torrington argues that the defendant's argument that a request for verification for good cause must substantiate the degree of impact of any alleged deficiencies in a response on a respondent's dumping margin imposes an impossible standard for showing good cause. Torrington argues that given the complexity of responses to be analyzed and the time constraints involved, it would be impossible for a domestic interested party to meet this burden. *Torrington's Reply* at 29–30.

Finally, Torrington argues that the defendant's argument that verification in Washington, D.C. was rejected for logistical and procedural reasons is weak. *Id.* at 30–31.

■ As an initial matter, this Court finds that there is no support for Torrington's contention that the ITA should have conducted limited verification in Washington, D.C.

After examining the administrative record, this Court finds that the ITA sent FAG a deficiency letter requesting FAG to supplement its cost response in order to deal with many of the problems identified by Torring-

ton. AR Ger.Pub.Doc. No. 326. FAG provided all the information requested by the ITA. AR Ger.Pub.Doc. Nos. 361, 377, 408, 411, 412. ITA deemed FAG's cost response and supplemental submissions adequate and used FAG's cost data for the Final Results.

Torrington argues that if good cause, defined "as a significant issue of law or fact, changed or special circumstances, discrepancies found in previous verifications, or the likelihood of a significant impact on the result" or comparable circumstances, exist, the ITA is *required* to conduct verification. *See Torrington's Memorandum* at 22 (*quoting* H.R.Rep. No. 725 at 43). The above quotation represents examples of what Congress thought *could* be considered good cause. Nothing leads this Court to the conclusion that the presence of any one of these circumstances requires the ITA to conduct verification.

Torrington argues that there were significant issues of fact in dispute in regard to FAG's cost response. However, the ITA was aware of these issues and dealt with, and resolved them, to its satisfaction. AR Ger. Pub.Doc. Nos. 326, 361, 377, 408, 411, 412.

■ However, this Court believes the ITA goes too far in arguing that a party requesting verification for good cause must be able to substantiate the degree of impact alleged problems will have on the respondent's dumping margin. All that is required is that the party requesting verification present a reasonable argument that there will be a significant impact. This does not mean that the party must exactly quantify the impact on the dumping margin.[2]

■ But even a showing of a potentially significant impact on dumping margins is not enough. The statute and regulations clearly leave to the ITA's discretion the determination of whether good cause for verification exists. 19 U.S.C. § 1677e(b); 19 C.F.R. § 353.36(a)(iv). If the ITA is satisfied with a respondent's data and determines that good cause to verify does not exist, and the ITA's determination is supported by substantial ev-

---

2. In certain cases a significant impact could be 0.01% if it means the difference between assess-

ment of duties and having a *de minimis* margin.

idence on the administrative record, this Court will uphold the ITA's determination. 19 U.S.C. § 1516a(b)(1)(B).

As discussed above, the ITA closely examined FAG's cost response, requested additional information, and decided that good cause for verification did not exist. This Court finds that in this case the ITA's determination was supported by substantial evidence on the administrative record and is affirmed.

### 5. Failure to Verify INA's Cost Response

Torrington alleges that the ITA was also wrong not to verify INA's cost response. Torrington repeats the same arguments used in regard to the ITA's failure to verify FAG's cost response. *Torrington's Memorandum* at 17–30. Torrington alleges that the analysis of INA's cost response that it presented to the ITA showed that discrepancies in the response proved that good cause existed for verification of INA's cost response. *Id.* at 17–21, 27–29. Torrington primarily relies on the fact that INA failed the cost verification in the initial investigation and that INA had allegedly developed a new cost accounting system solely for purposes of this review. *Id.*

Defendant repeats the arguments it made in regard to the ITA's failure to verify FAG's cost response. *Defendant's Memorandum* at 3–12. Defendant states that it considered INA's cost response, deficiency responses and the successful verification of INA's home market sales data and found that good cause for verification did not exist. *Id.* at 7–8.

INA essentially agrees with the defendant's arguments. *INA's Memorandum* at 3–11.

For the reasons stated above in regard to verification of FAG's cost response, this Court finds that the statute and regulations clearly leave to the ITA's discretion the determination of whether good cause for verification exists. 19 U.S.C. § 1677e(b); 19 C.F.R. § 353.36(a)(iv). If the ITA is satisfied with a respondent's data and determines that good cause to verify does not exist, and the ITA's determination is supported by substantial evidence on the administrative rec-

ord, this Court will uphold the ITA's determination. 19 U.S.C. § 1516a(b)(1)(B).

In regard to INA, the ITA closely examined INA's cost response, requested additional information, and decided that good cause for verification did not exist. *See* AR Ger. Pub.Doc. Nos. 273, 299, 305, 325, 327, 336, 338, 349, 352, 370, 402. This Court finds that in this case the ITA's determination was supported by substantial evidence on the administrative record and is affirmed.

### 6. Adjustment to FMV for SKF's Pre-sale Inland Freight

■ In the Final Results, the ITA deducted all of SKF's pre-sale movement expenses from its calculation of FMV stating:

> [W]e have determined that pre-sale inland freight should be treated as a movement expense and deducted from foreign market value. Because we do not treat pre-sale and post-sale movement charges differently in calculating an ex-factory U.S. price, we must treat these expenses in a similar manner in the home market, to ensure an equitable price-to-price comparison.

*Final Results,* 56 Fed.Reg. at 31,715.

Torrington argues that the ITA's decision to deduct all pre-sale movement expenses from FMV is contrary to past ITA practice and the decision of this court in *Silver Reed America, Inc. v. United States,* 7 CIT 23, 34–35, 581 F.Supp. 1290, 1298–99 (1984), *rev'd on other grounds sub nom. Consumer Prods. Div., SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033 (Fed.Cir.1985). *Torrington's Memorandum* at 40–45. Torrington argues that the ITA is making this adjustment pursuant to its authority to adjust FMV for differences in circumstances of sales. *See* 19 U.S.C. § 1677b(a)(4)(B) (1988); 19 C.F.R. § 353.56(a) (1991).

Specifically, Torrington argues that in order for the ITA to make an adjustment to FMV for a difference in circumstance of sale, the expense at issue must be directly related to the sales being investigated. Torrington points out that the court in *Silver Reed,* 7 CIT at 34–35, 581 F.Supp. at 1298–99, upheld ITA's past practice of denying an adjustment to FMV for pre-sale expenses which could

not be directly tied to sales. *Torrington's Memorandum* at 43–45. Torrington argues that *Silver Reed* is directly on point because here SKF was unable to tie its pre-sale movement charges directly to the sales under investigation. *Id.* at 44–45. Torrington argues that pre-sale home market movement expenses are general overhead expenses which cannot be directly tied to sales. *Id.*

Torrington admits that this court recently upheld the ITA's new practice of deducting all pre-sale movement expenses from FMV in *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 16 CIT ——, ——, 787 F.Supp. 208, 211–13 (1992), but argues that this case was wrongly decided. *Torrington's Memorandum* at 45–47.

Defendant and SKF rely on this court's decision in *Ad Hoc Comm.,* 16 CIT at ——, 787 F.Supp. at 211–13. *Defendant's Memorandum* at 45–51; *SKF's Opposition* at 12–15.

Specifically, defendant and SKF argue that the ITA is required to deduct pre-sale movement expenses from U.S. price pursuant to 19 U.S.C. § 1677a(d)(2)(A) (1988) and 19 C.F.R. § 353.41(d)(2)(i) (1991), in order to arrive at an ex-factory price for U.S. sales. The statute and regulations do not address the deduction of pre-sale expenses from FMV. Defendant points out that by not deducting pre-sale expenses from FMV, which was the ITA's past practice, the ITA unfairly compared an ex-factory U.S. price with an ex-warehouse home market price. Defendant argues that the ITA's adjustment to FMV for pre-sale movement expenses is not dependant on its authority to adjust FMV for differences in circumstances of sale, but rather upon the ITA's inherent authority to make an "apples with apples" comparison. *Defendant's Memorandum* at 47–50. Defendant points out that the ITA's rationale was recently sustained in *Ad Hoc Comm.,* 16 CIT at ——, 787 F.Supp. at 211–13.

The reasoning of this Court in upholding the ITA's treatment of pre-sale inventory carrying costs in this case is equally applicable to the ITA's treatment of pre-sale movement expenses. The ITA's decision to compare U.S. price to home market price at a contemporaneous point in the chain of commerce is reasonable. *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1576. In this case, the ITA has chosen an ex-factory price as the contemporaneous point in the chain of commerce. In order to make this comparison certain expenses need to be removed from both U.S. and home market prices. This Court finds nothing unreasonable in the ITA's removal of pre-sale movement expenses from both U.S. and home market prices as measured from the same point in the chain of commerce, in this case ex-factory. *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1576; *Ad Hoc Comm.,* 16 CIT at ——, 787 F.Supp. at 211–13. This method of treating pre-sale home market movement expenses has also been specifically upheld by this court in a well reasoned opinion in *Nihon Cement Co. v. United States,* 17 CIT ——, ——, Slip Op. 93–80 at 30–34, 1993 WL 185208 (May 25, 1993).

Therefore, this Court affirms the ITA's deduction of SKF"s pre-sale movement expenses from FMV.

### 7. *SKF's Home Market Discounts*

In the Final Results of this administrative review, the ITA stated that in regard to discounts:

> The Department generally allows adjustments to home market price and USP for discounts and rebates where respondents have granted and paid them on sales of subject merchandise to unrelated parties during the period of review. Such discounts or rebates should be part of a respondent's standard business practice and not intended to avoid potential antidumping duty liability. The Department generally makes an adjustment if discounts and rebates, granted pursuant to accurately and adequately described programs, are properly reported on a sale or customer-specific basis and are directly associated with the products or sales under consideration.
>
> . . . .
>
> SKF: SKF granted rebates on a customer-specific basis. The Department verified that rebates per customer were

accrued for sales which occurred during an agreed-upon time period or up to a certain agreed-upon amount, and then paid to the customer. We traced from payments of rebates to documentation justifying why the payments were made. SKF demonstrated that its rebates were legitimate and based on agreements. For the purpose of allocating rebates for this review, SKF divided the total rebates given to each customer during a given time period by the total sales to that customer. We found the allocation of discounts and rebates by SKF–FRG, SKF–France, and SKF–Italy to be consistent and reasonable; therefore, we have not changed our calculations from the preliminary determination.

*Final Results,* 56 Fed.Reg. at 31,717–18.

Torrington argues that discounts relate directly to price and therefore an adjustment to FMV, as the ITA made here, should not be allowed unless SKF demonstrates a direct relationship between a specific discount and a specific sale. Torrington alleges that SKF allocated discounts over all sales without showing that each individual sale was subject to a discount. Torrington argues that allocation is allowed only when a respondent shows on the record that all sales of the subject merchandise were eligible for, and received, a discount. *Torrington's Memorandum* at 49–53.

Defendant concedes that it incorrectly treated SKF's home market discounts as directly related expenses to be deducted from FMV. Defendant states that this Court's decision in *Koyo Seiko Co. v. United States,* 16 CIT ——, ——, 796 F.Supp. 1526, 1529–30 (1992), requires that direct selling expenses be shown to have a reasonably direct relationship to the sales under consideration. Defendant alleges that this direct relationship was not demonstrated if discounts were incurred on a transaction-specific basis but were allocated over all sales on a customer-specific basis as SKF did here. Therefore, defendant requests this Court to remand this issue to the ITA "for reconsideration of those home market cash discounts that were not reported on a transaction-specific or model-specific basis and the recalculation of foreign market values where warranted...." *Defendant's Memorandum* at 51.

SKF admits that it allocated all home market discounts for SKF GmbH over all home market sales due to the manner in which SKF GmbH's records were kept. *SKF's Opposition* at 18.

SKF argues that it was reasonable for the ITA to accept SKF's method of reporting discounts and requests this Court to sustain the ITA's actions in regard to this issue.

In addition, SKF argues that it has been caught by surprise by the defendant's change of position on this issue. SKF argues that there is no statutory basis for the defendant to change its position in regard to its final administrative determination after judicial review of that determination has commenced. *Reply Brief of SKF USA Inc. and SKF GmbH ("SKF's Reply")* at 2–3. SKF argues that the ITA's unilateral decision to reverse its position in regard to SKF's discounts denied SKF due process by not allowing SKF the opportunity to comment on the ITA's new position and possibly correct problems with its information submission. *Id.* at 5–7.

SKF argues that the ITA's articulation of a new standard in regard to granting adjustments for discounts which will be given retroactive effect was unfair and unlawful. SKF points out that retroactive application of the law is frowned upon, citing *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). *SKF's Reply* at 7–10.

SKF also argues that it has relied on the ITA's previous position on this issue in its efforts to try to eliminate dumping by the company. The change in ITA's position may result in the creation of dumping margins during the second, third and part of the fourth administrative reviews which would not have existed under the ITA's old methodology. *SKF's Reply* at 10–15.

SKF argues that *Koyo Seiko,* 16 CIT at ——, 796 F.Supp. at 1529–30, does not invalidate the reporting methodology used by SKF for discounts. *SKF's Reply* at 16–18.

SKF argues that the ITA's new transaction-specific standard should be rejected. *Id.*

at 20–22. However, if this Court finds the ITA's new standard to be reasonable and in accordance with law, SKF requests the Court to determine that SKF has met the new standard. *Id.* at 22–24. At a minimum, SKF requests this Court to direct the ITA to allow an indirect adjustment to FMV for SKF's discounts. *Id.* at 24–25.

Torrington argues that it is well settled that the ITA may request a remand to correct errors in its application of the law as well as other types of clerical errors. *Surreply of The Torrington Company to the Reply Brief of the SKF Companies.*

■ As an initial matter, this Court finds that SKF's argument that the defendant is precluded from requesting a remand when it believes that it has incorrectly applied the law is completely without foundation. As this court has stated:

> The law is clear that remand is appropriate where an agency has followed an improper method in making a determination or where there has been a defect in the agency's finding. *See, e.g., Ford Motor Co. v. NLRB,* 305 U.S. 364, 374–75 [59 S.Ct. 301, 307–08, 83 L.Ed. 221] (1939); *Greene County Planning Bd. v. Federal Power Comm'n,* 559 F.2d 1227 (2d Cir.1977) (en banc), *cert. denied,* 434 U.S. 1086 [98 S.Ct. 1280, 55 L.Ed.2d 791] (1978).

*Timken Co. v. United States,* 7 CIT 319, 320, 1984 WL 3725 (1984).

■ As to the merits of this issue, the Court of Appeals for the Federal Circuit has stated that in order for a discount or rebate to qualify as a direct cost to be subtracted from FMV, the discount or rebate must have been actually paid on all of the sales under consideration and allocated on the basis of actual cost and sales figures. *Smith–Corona Group v. United States,* 713 F.2d 1568, 1580 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). In *Koyo Seiko,* 16 CIT at ——, 796 F.Supp. at 1530, this Court upheld the ITA's treatment of Koyo Seiko Co., Ltd.'s ("Koyo Seiko") post sale price adjustments as indirect selling expenses because these post sale price adjustments could not be directly correlated with sales of the subject merchandise using verified cost and sales information. In addition, this Court has found that rebates paid on out of scope merchandise may not be used in the calculation of deductions for expenses from FMV for in-scope merchandise. *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1578–79.

The statute and the ITA have a preference for respondents to provide actual expense information as opposed to allocated expense information. As a result, the ITA generally gives respondents an incentive to provide the ITA with actual expense information. The ITA does this by classifying actual expense information in a way which gives greater benefit to the respondent and classifying allocated information in a way which gives a respondent less benefit. This can lead to differing treatment of the same kind of expenses in the calculation of USP and FMV.

A respondent benefits by having home market expenses characterized as direct because generally FMV will be adjusted only for direct expenses. 19 U.S.C. § 1677b(a)(4)(B); *Consumer Prods. Div.,* 753 F.2d at 1037–38. If the respondent fails to meet the standard for receiving a direct adjustment to price for its home market expenses, the expense will be treated as an indirect expense because this treatment is adverse to the respondent. 19 C.F.R. § 353.56(b)(2) (1991) (indirect selling expenses deducted from FMV only in relation to ESP transactions and only up to amount of indirect selling expenses deducted from USP). Allocated expenses in the U.S. market are treated as direct expenses because direct expenses will be deducted from all USP transactions which will, therefore, reduce USP and potentially increase dumping margins. 19 U.S.C. § 1677a(d)(2)(A) (1988). If these expenses were treated as indirect expenses, they would only be deducted from USP in regard to ESP transactions and will, therefore, reduce USP and potentially increase the dumping margin only for ESP transactions. 19 U.S.C. § 1677a(e)(2) (1988). Therefore, treatment of these expenses as indirect expenses would destroy any incentive a respondent has to provide the ITA with actual expense information. This court has affirmed this method of providing an incentive for respondents to provide actual

expense information. *Timken Co. v. United States,* 11 CIT 786, 804, 673 F.Supp. 495, 512–13 (1987).

It is clear that discounts can be deducted from FMV if the actual expense information is reported to the ITA on a transaction-specific or product-specific basis. 19 U.S.C. § 1677b(a)(4)(B). It is also clear that discounts paid on the subject merchandise can be allocated over all sales of the subject merchandise as long as discounts paid only on the subject merchandise are used to calculate the per-unit amount of discount to be deducted and the discounts "can be directly correlated with specific merchandise using verified cost and sales information." *Smith–Corona,* 713 F.2d at 1580. If a respondent is unable to provide the ITA with transaction-specific or product-specific discount amounts, the ITA must look to the information provided by the respondent to determine if the reported allocated discounts were only made on and allocated to sales of the subject merchandise and can be tied to verified cost and sales data. In order for the ITA to accept discounts or rebates allocated on a customer-specific basis as direct costs, the percentage amount of each discount or rebate paid must be the same for each type of the subject merchandise sold and the total amount of discounts or rebates paid to each customer must be allocated over all sales of the subject merchandise made to that customer. If this relationship is not shown to the satisfaction of the ITA, but the aggregate amounts of discounts paid on the subject merchandise have been verified, the discounts are to be treated as indirect selling expenses. *Koyo Seiko,* 16 CIT at ——, 796 F.Supp. at 1530.

Therefore, this Court remands this issue to the ITA to determine if SKF's method of reporting discounts in the home market for SKF GmbH meets the standard required for those discounts to be treated as direct selling expenses and subtracted from FMV. If the information on the administrative record does not support treatment of these discounts as direct expenses, the ITA will treat these discounts as indirect selling expenses since the ITA has already verified the total amounts in question. In addition, this Court cannot tell on the basis of the administrative

record if discounts paid on SKF's sales of out of scope merchandise were used in the calculation of the adjustment to FMV for SKF's home market sales discounts. This Court cannot allow the ITA to use a methodology which allows for the inclusion of discounts paid on out of scope merchandise in calculating adjustments to FMV and ultimately the dumping margins. *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1579. Therefore, upon remand the ITA is directed to develop a methodology which removes discounts paid on sales of out of scope merchandise from any adjustments made to FMV for discounts or, if no viable method can be developed, to deny such an adjustment in its calculation of FMV.

## 8. *FAG's Currency Hedging Expenses*

In the Final Results, the ITA granted FAG an adjustment to FMV for currency hedging gains or losses in regard to the repatriation in Deutsche marks to FAG–Germany of U.S. dollars earned on its U.S. sales. The ITA explained its grant of this adjustment stating:

In the specific factual pattern presented in this case, we found that it was appropriate to make a circumstance-of-sale adjustment to reflect hedging profits or losses accurately, where these profits or losses were properly documented and verified.

To demonstrate that hedging has affected the actual exchange rate that it has received for its sales, a respondent must show the Department the actual exchange rate contracts that it entered into and demonstrate that these contracts are tied directly to the sales made during the period of review. In addition, the respondent must then accurately report the exchange rate that it used on these sales and include this information in its listing of individual sales and adjustments.

In these reviews FAG–FRG reported that it used the forward market to ensure a certain exchange rate for each of its U.S. sales. At verification FAG–FRG provided examples of its forward contracts and demonstrated that it had exchanged dollars received from its sales in the U.S. at the rates specified in those contracts. The

rates FAG–FRG realized on its sales differed substantially from the Federal Reserve rates.

When we examined FAG–FRG's listings of U.S. sales and the adjustment it gave to reflect the actual exchange rates it used on these sales, we found that it based these adjustments for 1989 on the average of the actual exchange rates it used through its forward contracts in 1989.... Although the Department would prefer a more precise measure of the actual rate a company realized, *e.g.,* a rate based on a monthly average or one tied directly to the forward contracts of each U.S. sale, we verified the accuracy of FAG–FRG's 1989 data and allowed a hedging adjustment based on the average actual exchange rate it realized on sales in that year. Our regulations clearly state that the Department is to rely on the Federal Reserve rates to convert foreign currencies to U.S. dollars (19 CFR § 353.-56(a)). We have used the Federal Reserve rates for our calculations for FAG–FRG. However, because FAG–FRG clearly demonstrated for its 1989 sales that, through the use of forward markets, it received different amounts for its U.S. sales than our calculations would normally indicate, it is appropriate for the Department to take this action into account. Forward markets are clearly a tool that businesses can use to insure the actual return they receive on their sales.

*Final Results,* 56 Fed.Reg. at 31,726.

Torrington challenges this adjustment to FMV for gains and losses realized on currency hedging in regard to the transfer of money from the U.S. to Germany generated from FAG's U.S. sales. Specifically, Torrington argues that 19 U.S.C. § 1677a(d), (e) (1988) specifies the adjustments that can be made to USP and that these provisions make no allowance for adjustment for currency hedging expenses. *Torrington's Memorandum* at 59–61.

In addition, Torrington argues that 19 U.S.C. § 1677b(a)(4)(B) requires that any COS adjustment granted to FMV be directly related to the sales under review. Torrington argues that since FAG made periodic large scale transfers of money from FAG–

U.S. to FAG–Germany, there is no evidence on the record linking the specific sales under review to the amounts of money transferred to FAG–Germany and, therefore, no adjustment to FMV is warranted. *Torrington's Memorandum* at 61–63.

Defendant argues that the ITA is granted substantial deference in determining what constitutes a "difference in circumstances of sale." Defendant states that the issue of whether an adjustment for currency hedging should be made has arisen in several cases before this court. Defendant argues that these decisions have never challenged the ITA's authority to make an adjustment to FMV for currency hedging, but, rather focused on whether the party claiming the adjustment had established a sufficiently direct relationship between the hedging activities and the sales under review. *Defendant's Memorandum* at 52–53 (*citing General Housewares Corp. v. United States,* 783 F.Supp. 1408, 1414–15 (CIT 1992); *LMI–LA Metalli Industriale, S.p.A. v. United States,* 712 F.Supp. 959 (CIT 1989), *aff'd in part, rev'd in part,* 912 F.2d 455 (Fed.Cir.1990)).

Defendant further argues that the goal of the antidumping law is to make a fair comparison and that cannot occur without accounting for currency hedging. *Defendant's Memorandum* at 53–54.

Finally, defendant argues that the ITA verified FAG's claimed currency hedging expenses and found that a sufficiently direct relationship exists between these expenses and the sales under review. *Id.* at 56–57.

FAG argues that the purpose of an administrative review is to determine the difference between the level of profit realized by a firm on its sales in the U.S. and its sales in its home market or a third country. FAG argues that the ITA must compare a producer's return on its U.S. sales to its return on its home market or third country sales. If a producer realizes a return which is affected by its currency hedging activities, FAG argues that these effects should be accounted for. FAG argues that 19 U.S.C. § 1677b(a)(4)(B) allows for an adjustment to FMV in situations where currency hedging creates a difference in circumstance of sale

which is directly related to the sales under review and affects the return realized by a producer on its U.S. sales. FAG compares an adjustment for currency hedging expenses to adjustments made for price discounts, which this court has upheld as a valid adjustment made directly to price or as a COS adjustment, in that both affect the price received by the foreign producer. *FAG's Memorandum* at 64–70.

As to Torrington's argument that 19 U.S.C. § 1677a(d), (e) allows only for specific adjustments to USP, FAG argues that the statute does not preclude other types of adjustments to USP. *Id.* at 70–71.

Finally, Fag argues that the ITA verified FAG's claimed adjustments for currency hedging expenses and that there is sufficient evidence on the administrative record to establish a direct link between these expenses and the sales under consideration which justifies a COS adjustment to FMV. *Id.* at 71–72.

Torrington responds to the defendant and FAG's arguments by pointing out that calculations of dumping margins are made in U.S. dollars and that 19 C.F.R. § 353.60(a) (1991) requires that any currency conversions be made from a foreign currency into U.S. dollars at Federal Reserve rates. Torrington argues that the focus of an antidumping duty review is not to determine the relative profitability of a producer's sales in the U.S. market as compared to its home or third country market, but to determine the difference in the price paid in U.S. dollars for the merchandise in the U.S. to FMV in U.S. dollars. Torrington argues that, at best, currency hedging expenses may be an indirect selling expense. *Torrington's Reply* at 26–27.

This Court finds that FAG's characterization of the purpose of antidumping duty reviews is wrong. The purpose is to calculate the U.S. price received by a foreign producer on its sales in the U.S. market adjusted to an ex-factory price and compare it to the price received by the producer on its home market or third country sales adjusted to an ex-factory price. 19 U.S.C. § 1675(a)(2) (1988). This comparison is made in U.S. dollars. 19 C.F.R. § 353.60(a). FAG's profits or losses generated through its currency hedging ac-

tivities in regard to its transfer of funds generated in the U.S. have nothing directly to do with the price paid for FAG's merchandise in the U.S. market. The key issue in an administrative review of an outstanding antidumping duty order is to compare the price paid in the U.S. to the price paid in the home market or third country market, not the return realized by the respondent on sales made in the two markets.

In addition, FAG's analogy to discounts is misplaced. Discounts directly affect the price paid for the merchandise and are, therefore, correctly accounted for in calculating USP. Currency hedging expenses are not directly related to the price paid in the U.S. market but only with the transfer of money generated from U.S. sales and *other activities* back to Germany. Indeed, there is evidence on the administrative record that FAG itself treated these profits and losses as "other operating income" rather than "net sales." *See* AR Ger.Pub.Doc. No. 330.

Therefore, this Court finds that the ITA's treatment of FAG's currency hedging expenses as direct expenses subject to a COS adjustment to FMV was not in accordance with law. Currency hedging expenses are not directly related to the specific sales of the subject merchandise under review but are part of the general expenses incurred by FAG while doing business in the U.S.

Finally, the cases cited by the defendant to support its position do not in fact do so. The court in *LMI–LA Metalli*, 13 CIT 305, 314–16, 712 F.Supp. 959, 966–68, and *General Housewares Corp.*, 16 CIT ——, ——, 783 F.Supp. 1408, 1414–17, never addressed the issue of whether the grant of COS adjustments to FMV for currency hedging activities was in accordance with law or whether these expenses should be classified as direct or indirect expenses. The court simply held that, on the administrative record before it, the ITA was correct to deny a COS adjustment because respondents had failed to show a direct relationship between the sales under review and the results of the currency hedging activities. *LMI–LA Metalli*, 13 CIT at 314–16, 712 F.Supp. at 966–68; *General*

*Housewares Corp.,* 16 CIT at ——, 783 F.Supp. at 1414–17.

Based on the facts of this case, this Court finds that gains or losses from currency hedging are part of the indirect expenses of a company doing business in the U.S. market and should be treated as such pursuant to 19 C.F.R. § 353.56(b)(2). This issue is remanded to the ITA to treat these expenses as indirect selling expenses.

### Conclusion

In accordance with the foregoing opinion, this case is remanded to the ITA to add the full amount of VAT paid on each sale in the home market to FMV without adjustment; to determine if SKF's method of reporting discounts in the home market for SKF GmbH meets the standard required for those discounts to be treated as direct selling expenses and subtracted from FMV or if information on the administrative record does not support deduction as direct expenses, to treat these discounts as indirect selling expenses; to develop a methodology which removes discounts paid on sales of out of scope merchandise from any adjustments made to FMV for SKF's discounts or, if no viable method can be developed, to deny such an adjustment in its calculation of FMV; and to treat FAG's currency hedging expenses as indirect selling expenses pursuant to 19 C.F.R. § 353.56(b)(2). ITA's determination is affirmed in all other respects. Remand results are due within sixty (60) days of the date this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.

### ORDER

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the ITA to add the full amount of VAT paid on each sale in the home market to FMV without adjustment; to determine if SKF's method of reporting discounts in the home

market for SKF GmbH meets the standard required for those discounts to be treated as direct selling expenses and subtracted from FMV or if information on the administrative record does not support deduction as direct expenses, to treat these discounts as indirect selling expenses; to develop a methodology which removes discounts paid on sales of out of scope merchandise from any adjustments made to FMV for SKF's discounts or, if no viable method can be developed, to deny such an adjustment in its calculation of FMV; and to treat FAG's currency hedging expenses as indirect selling expenses pursuant to 19 C.F.R. § 353.54(b)(2); and it is further

**ORDERED** that the ITA's determination is affirmed in all other respects; and it is further

**ORDERED** that remand results are due within sixty (60) days of the date this opinion is entered, comments or responses by the parties to the remand results are due within thirty (30) days thereafter and any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.