**THYSSEN STAHL AG, Thyssen Steel Detroit Co., and Thyssen Inc., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

Slip Op. No. 95–78.
Court No. 93–09–00586–AD.

United States Court of International Trade.

April 27, 1995.

Sharretts, Paley, Carter & Blauvelt, P.C., New York City (Gail T. Cumins, Ned H. Marshak and Beatrice A. Brickell), for Thyssen Stahl AG, Thyssen Steel Detroit Co. and Thyssen Inc.

Skadden, Arps, Slate, Meagher & Flom, Washington, DC (Robert E. Lighthizer and John J. Mangan) and Dewey Ballantine, Washington, DC (Alan Wm. Wolff, Michael H. Stein, Bradford L. Ward and Guy C. Smith), for AK Steel Corp., Bethlehem Steel Corp., Gulf States Steel Inc. of Alabama, Inland Steel Industries, Inc., LTV Steel Co., Inc., National Steel Corp., Sharon Steel Corp., U.S. Steel Group a Unit of USX Corp., WCI Steel, Inc. and Lukens Steel Co.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, and Velta A. Melnbrencis, Asst. Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice; and Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce (Jeffrey C. Lowe), Washington, DC, of counsel, for defendant.

AQUILINO, Judge:

This action consolidates CIT No. 93–09–00586 commenced by Thyssen Stahl AG, Thyssen Steel Detroit Co. and Thyssen Inc. and CIT Nos. 93–09–00609 and 93–09–00610 brought by AK Steel Corp., Bethlehem Steel Corporation, Gulf States Steel Inc. of Alabama, Inland Steel Industries, Inc., LTV Steel Co., Inc., National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group, a Unit of USX Corporation and WCI Steel, Inc.[1] These firms have all interposed motions for judgment on the record compiled by the International Trade Administration, U.S. Department of Commerce ("ITA") *sub nom. Notice of Final Determinations of Sales at Less Than Fair Value: Certain Hot–Rolled Carbon Steel Flat Products, Certain Cold–Rolled Carbon Steel Flat Products, Certain Corrosion-resistant Carbon Steel Flat Products and Certain Cut–to–Length Carbon Steel Plate From Germany,* 58 Fed.Reg. 37,-136 (July 9, 1993), *amended,* 58 Fed.Reg. 44,170 (Aug. 19, 1993).

Jurisdiction of this court is based on 28 U.S.C. § 1581(c), with the standard of judicial review of the issues raised whether the challenged agency determination is unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B).

## I

The motion of Thyssen Stahl *et al.,* which will be referred to hereinafter as that of the "plaintiffs", seeks judgment on the ground that the ITA's reliance on best information otherwise available rather than on data submitted by Thyssen satisfies both prongs of that standard for judicial reversal. In addition, the plaintiffs assert that the methodology chosen to calculate that best information is unsupported by substantial evidence on the record.

## A

■ Section 1677a(c)(2)(A) of Title 19, U.S.C. (1993) provided for a reduction to United States price ("USP") by

the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States.

*See also* 19 C.F.R. § 353.41(d)(2)(i) (1993). Requesting an adjustment under this section, Thyssen provided the ITA with "a computer tape and printout, in which an average ocean freight cost ... per metric ton ... was calculated based on the weight of steel shipped." Brief of Plaintiffs, p. 8. The agency sought more supporting documentation, whereupon Thyssen also submitted "a sample ocean freight invoice from an ocean carrier, ... along with worksheets which had been utilized to calculate the average ocean freight costs, previously submitted." *Id.* at 8–9. *See* Plaintiffs' Confidential Appendix ("ConfApp"), Exhibit 5.

For purposes of its preliminary determination[2], the ITA adjusted USP by deducting ocean-freight costs as reported by Thyssen. However, in its final determination the agency resorted to best information otherwise available upon the following rationale:

... Thyssen provided only one, self-selected, freight invoice to support its calculations. We therefore determine that Thyssen failed verification on this point and that as a result, resort to BIA is warranted. As BIA, we have used the highest non-aberrational ocean freight charge we calculated from Thyssen's ... worksheet.

58 Fed.Reg. at 37,150 (*Comment 15*). In its concurrence memorandum accompanying the final determination, the ITA explained further that

Thyssen calculated a weighted average ocean freight charge for both cold-rolled and corrosion resistant ... based on all shipments during the period of investigation for its two predominant product codes.... We verified that the calculations included data from all relevant shipments. Thyssen provided one freight in-

---

**1.** Lukens Steel Company is also a named party plaintiff in CIT No. 93–06–00610.

**2.** *See* 58 Fed.Reg. 7,095 (Feb. 4, 1993).

voice which supported their calculations. This invoice covered about 14 percent of the shipments which went into the calculations.

Defendant's ConfApp, Exhibit 8 at 32.

The plaintiffs dispute both the factual allegations quoted above and the agency's conclusion that they failed to provide adequate documentation for their ocean-freight costs. First, they contend that the final determination "ignores the fact that the DOC had in its possession an additional freight invoice ... submitted ... on November 18, 1992", which by the ITA's own estimate represented a significant percentage of all subject merchandise shipped during the period of investigation. Brief of Plaintiffs, p. 16 n. 4. Second, the plaintiffs point to the agency verification report, which explains why additional ocean-freight invoices were not forthcoming:

> ... Since it was after normal business hours on the last day of verification in Germany when we addressed this topic and because the documents were kept in a different city, Thyssen was unable to provide more freight invoices.

Plaintiffs' ConfApp, Exhibit 7 at 44. According to them, this explanation was accepted; the ITA did not express any dissatisfaction with the information and documentation provided and did not request that Thyssen forward additional invoices to Detroit when verification resumed. Brief of Plaintiffs, pp. 14–15. Furthermore, they assert that the correspondence between the parties did not indicate that the agency intended to examine the ocean-freight invoices during that process. Id. at 19–20. Rather, the verification outline requested that Thyssen provide all source documents used in creating its worksheets. Id. at 20. The plaintiffs contend they fully complied with this request:

> ... Pursuant to Thyssen's duty calculation system, which the DOC acknowledges was verified as to accuracy and completeness, the source documents for ocean freight utilized by Thyssen in preparing its Antidumping Questionnaire responses were the Thyssen Stahlunion commercial invoices to Thyssen Inc. During verification the DOC examined 10 Thyssen Stahlunion invoices on a preselected basis and 8 such invoices

on a surprise basis.... The ocean carrier invoices were merely secondary documents, providing additional corroboration of Thyssen's duty calculation system, which the DOC agreed was accurate and complete.

Id. The plaintiffs take the position that, if the ITA

> deemed the missing ... invoices ... essential documents, the absence of which would result in BIA, the DOC should have either: (1) requested these invoices in the Sales Verification Outline ... or (2) requested that Thyssen provide these documents to the DOC casehandlers when they continued their verification of Thyssen's ocean freight costs in Detroit [three weeks later].

Response Brief of Plaintiffs, pp. 3–4.

According to the agency, it is "not required to itemize beforehand every possible type of document" needed during verification, and its outline clearly indicated its list of items was "not necessarily all inclusive and we reserve the right to request any additional information or materials necessary for a full verification." Defendant's Memorandum, p. 19 and ConfApp, Exhibit 2 at 2. Similarly, the ITA is not required to request that missing information be provided at a future date. Defendant's Memorandum, p. 22. Rather, the defendant asserts that, if

> Commerce's requests for information are reasonable, a party must comply with them in full in order to avoid failing verification....
>
> In this case, it was reasonable and consistent with Commerce's general practice ... to require Thyssen to provide actual ocean carrier invoices to support its claimed average ocean freight adjustment.

Id. at 19–20.

The court is constrained to concur. Section 1677e of Title 19, U.S.C. (1993) required resort to the best information otherwise available whenever the ITA found itself "unable to verify the accuracy of the information submitted". See also 19 C.F.R. § 353.37 (1993). On its face, one ocean-freight invoice covering but 14 percent of the Thyssen shipments is minimal support for the accuracy of

the claimed average. And the remaining invoices would have been the primary, not "secondary", means of verification by the ITA.

While it appears, as the plaintiffs assert, that the agency did not consider the first invoice submitted in response to a deficiency request in its final determination[3], the court is unable to connect that invoice to the accompanying computer printout summarizing the ocean-freight costs for the period of investigation. *Cf.* Plaintiffs' ConfApp, Exhibit 5. In addition, it also appears from the invoice that the merchandise covered was hot-rolled ["HR. COILS"], which is not under review in this action. *See id.* The plaintiffs did not dispute this at oral argument, acknowledging that that invoice was "presented to confirm that ocean freight charges are billed in US dollars." Transcript of oral argument ("Tr.") at 7.

In sum, in the light of the record, the ITA's resort to best information otherwise available was in accordance with law.

### B

■ It resorted to "the highest non-aberrational ocean-freight charge" calculated for both cold-rolled and corrosion-resistant products. Defendant's ConfApp, Exhibit 8 at 32. The agency chose to rely on a single amount because "Thyssen used a single figure for both products in its questionnaire response". *Id.,* Exhibit 9 at 3.

In that response, Thyssen explained that one figure had been computed for cold-rolled and corrosion-resistant carbon steel products since freight is charged by weight and not type of product. *Id.,* Exhibit 3 at 34. However, the plaintiffs now take the position that a single amount for both products is inappropriate:

> ... [T]he DOC ... assign[ed] a single BIA rate for ocean freight ... notwithstanding the fact that each of these products constitute[s] a separate and distinct "class or kind" of merchandise ... [and] the fact that the DOC was capable of assigning separate BIA rates to each class....

The DOC's decision to punish Thyssen and to utilize a higher rate than that which has been proposed by petitioners[ ] represents a clear abuse of administrative discretion.... [T]he DOC should not have based BIA on a worst case analysis[ ] merely because other, more appropriate bases, including a methodology proposed by petitioners, were more advantageous to Thyssen.

Brief of Plaintiffs, pp. 22, 23 (footnote omitted). They argue that, as a "substantially complying respondent", the ITA "should have calculated ocean-freight costs on the basis of ocean-freight costs verified by the DOC in its examination of Thyssen Stahlunion invoices". *Id.* at 23–24.

■ The court's role is not to determine whether the information chosen was the "best" actually available. Rather, the court must affirm the agency's choice if supported by substantial evidence on the record and otherwise in accordance with law. *Manifattura Emmepi S.p.A. v. United States,* 16 CIT 619, 623, 799 F.Supp. 110, 115 (1992). While the record must demonstrate a "rational relationship between data chosen and the matter to which they are to apply", the Court of Appeals for the Federal Circuit has recognized that section 1677e permitted the ITA to make an adverse inference, and that such an inference is presumed not to be "punitive". *Id.; Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1190–91 (Fed.Cir.1990).

Here, the plaintiffs have not persuaded the court that the agency abused its discretion or that the rate chosen was "aberrant". *Cf. Nat'l Steel Corp. v. United States,* 18 CIT ——, ——, 870 F.Supp. 1130, 1136 (1994). Their contention that the ITA should have calculated ocean-freight costs by using the data "verified" during examination of Thyssen Stahlunion documents lacks merit. It ignores both the purpose of "best information" and the ITA's conclusion that the one invoice was not sufficient to verify the Thyssen calculations. Moreover, a rational relationship exists between the Thyssen data chosen by the agency and ocean-freight

---

**3.** The ITA argues that both the record and the final determination demonstrate that that invoice

was indeed considered and reviewed. *See* Defendant's Memorandum, p. 23.

costs. The court therefore must affirm the ITA's determination.

## II

The motion for judgment on the agency record presented by the domestic steel producers, which were the petitioners below, takes the position that the ITA erred in (a) adjusting upward USP to account for gains on currency hedging and (b) increasing USP by the amount of tax actually incurred on sales of the comparison home-market merchandise to account for the German value-added tax ("VAT") forgiven by reason of export.

## A

■ In its response to the agency's questionnaire, Thyssen had requested a circumstances-of-sale adjustment "to reflect the difference between the rate of exchange actually received and the official rate of exchange on date of sale" due to foreign-currency-exchange contracts previously entered into with a private bank. Domestic Steel Producers' ConfApp, Exhibit 2 at 28–29. Thyssen sought to explain that

> TSU [4] entered into several foreign exchange contracts to cover sales to the United States during the POI. Individual United States orders were applied to specific forward exchange contracts and, at the time of payment, TSU converted dollars into D[eutsche Marks] at the contract rate of exchange.

> \* \* \* \* \* \*

> Since the exchange contracts entered into by TSU are tied directly to sales which took place during the POI and since TSU has documented the hedging profits received on such sales, a circumstance[s] of sale adjustment is required....

4. AK Steel Corp. *et al.* describe the Thyssen corporate structure as follows:

> Thyssen Stahl AG ..., a member of Thyssen AG's "Steel Business Group," is a manufacturer in Germany of various flat-rolled steel products, including cold-rolled steel and corrosion-resistant steel. Thyssen Inc. ("TINC") ... and Thyssen Steel Detroit Co. ("TSD") are related companies that import the subject merchandise produced by Thyssen [Stahl AG] through

*Id.* at 27–28. In its final determination, the ITA agreed that an adjustment (to USP) was appropriate:

> ... The adjustment directly affects the net revenue earned by Thyssen on its U.S. sales. Therefore, we regard this adjustment as a selling expense which in exporter's sales price situations[ ] we deduct from the gross U.S. price pursuant to 19 C.F.R. 353.41(e). In this case, a gain was realized. Therefore the adjustment constitutes a "negative expense" which we have added to United States price.

58 Fed.Reg. at 37,149 (*Comment 7*). The agency also concluded that information provided by Thyssen demonstrated the requisite relationship between its currency exchanges and sales in the United States. *See id.* at 37,148.

The crux of the motion of AK Steel Corp. *et al.* is that neither the statute nor the regulations granted the ITA authority to adjust USP upward for a gain from foreign-currency hedging and, even if the court were to hold otherwise, the record does not, in fact, establish a direct relationship between such gain and the merchandise sold during the period of the agency investigation. It is also contended that foreign-currency hedging in regard to sales in the United States is irrelevant to a dumping investigation.

The defendant responds that during the investigation the petitioners

> never questioned Commerce's legal authority to make an adjustment for hedging to U.S. price. AK Steel only questioned Commerce's factual finding that the currency hedging gains were directly related to the U.S. sales in issue.... Consequently, AK Steel failed to exhaust its administrative remedies on this issue.

Defendant's Memorandum, pp. 33–34. Alternatively, the defendant contends that it prop-

> another related company, Thyssen Stahlunion GmbH ("TSU"). TINC sells in the United States through its three operating divisions, Thyssen Steel Group East ..., Thyssen Steel Group West ... and Intemat. TSD also sells through an operating division, Thyssen. Steel Group Detroit....

Domestic Steel Producers' Motion, pp. 4–5. *See also* Domestic Steel Producers' ConfApp, Exhibit 1, pp. 2–5.

erly made the adjustment pursuant to 19 U.S.C. § 1677a(e)(2) (1993), which provided for a reduction in the sales price by the amount of expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially-identical merchandise. According to the defendant, "[c]urrency hedging expenses clearly fall within this broad category", and "section 1677a(e) gives ño indication that Congress intended to preclude Commerce from ... adjusting USP upward when currency hedging results in a gain, or a 'negative expense,' in order to properly account for the effect of hedging on the sales in question." *Id.* at 42.

### (1)

■ As a general rule, a party must exhaust administrative remedies before raising an issue in an action such as this. *E.g., Rhone Poulenc, S.A. v. United States,* 7 CIT 133, 134, 583 F.Supp. 607, 609 (1984). That is, "courts should not topple over administrative decisions unless the administrative body not only has erred but erred against objection made at the time appropriate under its practice." *United States v. Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952).

Here, the record reflects objection by AK Steel Corp. *et al.* regarding the ITA's legal authority. *See, e.g.,* 58 Fed.Reg. at 37,148 (*Comment 7*):

> We disagree with respect to petitioners' argument that our regulations require that any adjustment for currency hedging must be made as a circumstance[s] of sale adjustment to foreign market value rather than to United States price.

Moreover, even if this were not true, the court is possessed of statutory discretion with respect to claims of failure to exhaust administrative remedies. *See* 28 U.S.C. § 2637(d). *See generally Alhambra Foundry Co. v. United States,* 12 CIT 343, 347, 685 F.Supp. 1252, 1256 (1988), and cases cited therein. And exercise of that discretion does not favor defendant's position.

### (2)

On its face, the statute governing the merits does not support the defendant. Section 1677a(d) of Title 19, U.S.C. provided at the time of the investigation:

The purchase price and the exporter's sales price shall be adjusted by being—

(1) increased by—

(A) when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States,

(B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States;

(C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States ...

(D) the amount of any countervailing duty imposed on the merchandise ... to offset an export subsidy, and

(2) reduced by—

(A) ... the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States; and

(B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the country of exportation on the exportation of the merchandise to the United States....

Section 1677a(e) provided that the exporter's sales price be reduced

by the amount, if any, of—

(1) commissions for selling in the United States the particular merchandise under consideration,

(2) expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise, and

(3) any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise.

The regulations concomitant with the statute, which were published at 19 C.F.R. § 353.41(d) and (e) (1993), entailed similar provisions for increasing or reducing exporter's sales price. They did not contemplate currency hedging.[5]

■ Absent a clearly-expressed legislative intent to the contrary, the statutory language must be regarded as conclusive[6]; "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398, 401 (Fed.Cir.), *cert. denied sub nom. Cemex, S.A. v. United States,* — U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994), quoting *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). While the government argues here that the dollar is a "commodity"[7], and the present treatment is indeed "much like any other commodity"[8], this court cannot and therefore does not presume that Congress intended such a fate for its currency. *Cf.* U.S. Const., art. I, § 8, cl. 4.

(3)

The ITA's final determination at bar indicates that currency hedging has rarely been an issue in its antidumping proceedings. In *Final Determination of Sales at Less Than Fair Value: Brass Sheet and Strip From Italy,* 52 Fed.Reg. 816 (Jan. 9, 1987), *amended,* 52 Fed.Reg. 11,299 (April 8, 1987), the agency denied a circumstances-of-sale adjustment for currency hedging. That denial was affirmed on appeal *sub nom. LMI—LaMetalli Industriale, S.p.A. v. United States,* 13 CIT 305, 314–16, 712 F.Supp. 959, 966–68 (1989), *aff'd,* 912 F.2d 455, 458 (Fed.Cir. 1990). This court reiterated in *United Engineering & Forging v. United States,* 15 CIT 561, 570, 779 F.Supp. 1375, 1384 (1991), *aff'd,* 996 F.2d 1236 (Fed.Cir.1993), that the ITA "retains discretion in the application of exchange rates in order to properly determine whether sales have, or have not, been at less than fair value", citing *Pistachio Group of the Ass'n of Food Indus., Inc. v. United States,* 11 CIT 668, 671 F.Supp. 31 (1987); *The Budd Company, Wheel & Brake Div. v. United States,* 14 CIT 595, 746 F.Supp. 1093 (1990); *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States,* 10 CIT 424, 640 F.Supp. 255, *remand results aff'd,* 10 CIT 608, 645 F.Supp. 956 (1986). Notwithstanding its discretion, the government took the position in *United Engineering* that, in "doing business internationally, any firm assumes the risks that come with the possibility of changes in exchange rates" and that it

must follow its regulations, which clearly specify the rate to be applied. The rate so applied must be a "neutral" one, not one tied to a particular firm's alleged practices or policies at a given time and place.

agreements. *Cf.* H.R.Rep. 826, 103rd Cong., 2d Sess. 95–96 (1994).

---

**5.** The same can be said of 19 C.F.R. § 353.60 (1993), which set forth the ITA rules for conversion of foreign currency into the equivalent U.S. dollar amount.

The court notes in passing that, while the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (Dec. 8, 1994), has effectuated significant modification of the Trade Agreements Act of 1979, provision for foreign-currency-hedging gains or losses is not among the amendments. Section 225 of the new act, 19 U.S.C. § 1677b–1 (1995), for example, codifies the procedure for currency conversion but does not accommodate gains or losses from hedging

**6.** *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). *See also Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

**7.** Defendant's Memorandum, p. 36.

**8.** *Id.*

15 CIT at 570, 779 F.Supp. at 1384. Indeed, in a case almost as old as American antidumping law itself, namely, *Die Deutsche Bank Filiale Nurnberg v. Humphrey,* 272 U.S. 517, 519, 47 S.Ct. 166, 166, 71 L.Ed. 383 (1926), Mr. Justice Holmes opined:

> ... An obligation in terms of the currency of a country takes the risk of currency fluctuations and whether creditor or debtor profits by the change the law takes no account of it.... Obviously, in fact a dollar or a mark may have different values at different times but to the law that establishes it it is always the same.

Hedging was not directly at issue in either *Die Deutsche* or *United Engineering,* although this court's opinion in the latter case took note of the fact that that phenomenon had surfaced as an issue in ITA administrative reviews involving antifriction bearings from Germany and the United Kingdom. And the agency's final determination at bar points out that, in those proceedings, it had "made the currency hedging adjustment to United States price." 58 Fed.Reg. at 37,148 (*Comment 7*), citing *Preliminary Results of Administrative Review: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the United Kingdom,* 56 Fed.Reg. 11,197 (March 15, 1991). However, subsequent to issuance of that determination, *The Torrington Co. v. United States,* 17 CIT ——, 832 F.Supp. 379 (1993), was handed down, in which action the ITA had made a circumstances-of-sale adjustment to foreign-market value for the currency hedging shown to have a direct relationship with the sales at issue. The court, however, concluded that such an approach was inconsistent with the purpose of antidumping-duty reviews and not in accordance with law. It explicitly rejected the argument that the purpose "is to determine the difference between the level of profit realized by a firm on its sales in the U.S. and its sales in its home market or a third country", which entails a comparison between "a producer's return on its U.S. sales to its return on its home market or third country sales". 17 CIT at ——, 832 F.Supp. at 391.

> ... The purpose [of antidumping-duty reviews] is to calculate the U.S. price received by a foreign producer on its sales in the U.S. market adjusted to an ex-factory price and compare it to the price received by the producer on its home market or third country sales adjusted to an ex-factory price. 19 U.S.C. § 1675(a)–(2) (1988). This comparison is made in U.S. dollars. 19 C.F.R. § 353.60(a).... The key issue ... is to compare the price paid in the U.S. to the price paid in the home market or third country market, *not the return realized by the [exporter] on sales made in the two markets.*

17 CIT at ——, 832 F.Supp. at 392 (emphasis added). The court thus held that currency hedging is not directly related to either USP or foreign-market value. It concluded that, at most, gains or losses from currency hedging are "part of the indirect expenses of a company doing business in the U.S. market and should be treated as such pursuant to 19 C.F.R. § 353.56(b)(2)." [9]

While the ITA complied with the court's instructions on remand [10], the defendant now contends that *Torrington* does not hold that "currency hedging expenses may never be found to be directly related to particular sales" but was instead a narrow holding that such an adjustment was not supported on the record because the exporter had failed to demonstrate a direct relationship between the claimed currency-hedging expenses and the sales at issue. Defendant's Memorandum, p. 45 n. 22. *See also* Response Brief of Plaintiffs, pp. 14–15. The same is indicated herein however. To quote from the agency's final determination:

> ... Based on its anticipated sales, Thyssen negotiates foreign currency exchange contracts with a private banker. The con-

---

**9.** 17 CIT at ——, 832 F.Supp. at 393. The regulation cited provided that, in

comparisons with exporter's sales price, the Secretary will make a reasonable deduction from foreign market value for all expenses, other than those described in paragraph (a)(1) or (a)(2), incurred in selling such or similar

merchandise up to the amount of the expenses, other than those described in paragraph (a)(1) or (a)(2), incurred in selling the merchandise.

**10.** *See The Torrington Co. v. United States,* 18 CIT ——, ——, 853 F.Supp. 446, 449–50 (1994).

tracts specify that over a specific period of time, the banker agrees to purchase a particular amount of dollars at a fixed exchange rate. The contracts are non-specific with respect to market or merchandise, other than that they pertain to Thyssen's export business.

58 Fed.Reg. at 37,148 (*Comment 7*). This hardly bespeaks a direct relationship to the U.S. sales under consideration.

Alternatively, the defendant, citing *Koyo Seiko Co., Ltd. v. United States,* 36 F.3d 1565 (Fed.Cir.1994), argues that, even if *Torrington* does stand for the proposition that currency-hedging gains or losses must be treated as indirect selling expenses, it does not necessarily follow that such an adjustment must be made to foreign-market value and not USP. *See* Tr. at 37–38. In that case, however, the court of appeals simply held that neither the plain language of 19 U.S.C. § 1677a(e)(2) (1988) nor its legislative history precluded the ITA from adjusting an exporter's sales price by deducting all selling expenses, both direct and indirect, incurred in the U.S. market. The opinion does not address currency-hedging gains or losses or adjustments to foreign-market value pursuant to 19 C.F.R. § 353.56(b)(2) for indirect selling expenses.

In sum, this court is not persuaded that the law presently permits any adjustment in the computation of dumping margins for either gains or losses which result from the hedging of currencies. *Cf. Silver Reed America, Inc. v. United States,* 12 CIT 39, 45, 679 F.Supp. 12, 17 (1988) ("Defendant concedes that . . . it has not been the practice of ITA to make an adjustment for currency exchange rate gains or losses").

### B

■ The motion for judgment on the agency record of A.K. Steel Corp. *et al.* contends that the methodology used by the ITA to adjust USP pursuant to 19 U.S.C. § 1677a(d)(1)(C) (1993) to account for the German VAT forgiven by reason of export is contrary to both the plain meaning of the statute and recent case law. That section of

Title 19 stated that the purchase price and the exporter's sales price shall be adjusted by being increased by

the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.

*See also* 19 C.F.R. § 353.41 (1993). AK Steel Corp. *et al.* point out that, instead

of making the adjustment in the manner required by statute (*i.e.,* by adding to United States price the amount of the tax that would have been incurred if tax had been collected on exports to the U.S.), the Department increased United States price by the amount of tax actually incurred on sales of the comparison home market merchandise.

Domestic Steel Producers' Motion, pp. 44–45.

The defendant admits that the domestic steel producers' preferred methodology was indeed the one used by the agency in the preliminary investigations.[11] The ITA explained in the final determination, however, its rationale for altering the methodology as follows:

... On March 19, 1993, the United States Court of Appeals for the Federal Circuit, in affirming the decision of the Court of International Trade in *Zenith Electronics Corporation v. United States* [755 F.Supp. 397 (1990)], ... ruled that section 772(d)(1)(C) of the Tariff Act provides for an addition to U.S. price to account for taxes which the exporting country would have assessed on the merchandise had it been sold in the home market.... Accordingly ..., the Department has changed its methodology for foreign taxes from that used in the preliminary determinations.... [W]e have not calculated a hypothetical tax on the U.S. product, but have added to the U.S. price the absolute

---

**11.** *See Notice of Preliminary Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products From Argentina,* 58 Fed.Reg. 7,066, 7,069 (Feb. 4, 1993).

amount of tax on the comparison merchandise sold in the country of exportation.[12]

In the *Zenith* case referred to, which is reported at 988 F.2d 1573 (Fed.Cir.1993), the court addressed, among other things, whether the agency had improperly made circumstances-of-sale adjustment to foreign-market value. In concluding that the ITA was in error and that section 1677a(d)(1)(C) directed the agency to adjust only USP, the court noted that this

> statute by its express terms allows adjustment of USP in the *amount* of taxes on the merchandise sold in the country of exportation ... [and that] Commerce may eliminate the multiplier effect by adjusting USP by the amount, instead of the rate, of the *ad valorem* tax.

988 F.2d at 1582 n. 4 (emphasis in original).

It is this footnote upon which the ITA relied in the final determination at bar. However, the defendant now concedes that two recent decisions of this Court of International Trade have not taken that approach, namely, *Federal–Mogul Corp. v. United States,* 17 CIT ——, 834 F.Supp. 1391 (1993), *appeal Nos. 94–1097, 94–1104 argued Aug. 5, 1994* (Fed.Cir.), and *Avesta Sheffield, Inc. v. United States,* 17 CIT ——, 838 F.Supp. 608 (1993). Hence, the

> Department has changed its methodology.... From now on, the Department will add to USP the result of multiplying the foreign market tax rate by the price of the United States merchandise at the same point in the chain of commerce that the foreign market tax was applied to foreign market sales.

Defendant's Memorandum, p. 55, citing *Final Determination of Sales at Less Than Fair Value: Ferrosilicon From Brazil,* 59 Fed.Reg. 732, 733 (Jan. 6, 1994). *See also The Torrington Company v. United States,* 18 CIT at ——, 853 F.Supp. at 448–49, affirming ITA determination on remand to apply the "new" methodology to conform with the *Federal–Mogul* decision. In sum, the

agency is in agreement with AK Steel Corp. *et al.* and now seeks a remand for "recalculation of the adjustment to USP for taxes forgiven upon exportation of the plate to the United States." Defendant's Memorandum, p. 56.

In contrast, the plaintiffs contend that the methodology applied in the final determination was not inconsistent with the purpose of section 1677a(d)(1)(C):

> Th[e] statutory language does not direct the DOC to compute the amount of uncollected taxes in any specified manner; rather, the statute does not address this issue, thereby allowing the DOC to devise its own methodology for calculating the amount of taxes to be added to USP.

Response Brief of Plaintiffs, p. 38. Furthermore, they assert that the approach adopted by the ITA

> was expressly approved (in dicta) by the Federal Circuit in *Zenith,* and since in *Daewoo*[ ] the Federal Circuit emphasized the considerable deference to be accorded the DOC in interpreting Section 1677a(d)(1)–(C), it is clear that contrary to the Domestic Steel Producers' contentions, judicial precedent supports the DOC determination under review herein.

*Id.* at 42.

In *Federal–Mogul Corp. v. United States, supra,* the court concluded, however, that footnote 4 "is clearly at odds with the body of *Zenith* and the language of the statute and is *dicta*"[13], referring to the Federal Circuit's pronouncement that "title 19 explicitly requires Commerce to increase USP by the amount of tax that the exporting country *would have assessed on the merchandise if it had been sold in the home market.*" 17 CIT at ——, 834 F.Supp. at 1396, quoting 988 F.2d at 1580 (emphasis added). Relying on the emphasized language, the court held it "clear from this statement, as well as the language of the statute itself, that the sale price to which the VAT rate is to be applied is the USP". *Id.* The court relied on the

---

12. *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold–Rolled Carbon Steel Flat Products From Argentina, Appendix II, Issues Common to all Antidumping Investigations*

*of Flat–Rolled Steel Products.* 58 Fed.Reg. 37,-077, 37,078 (July 9, 1993).

13. 17 CIT at ——, 834 F.Supp. at 1396.

analysis in *Daewoo Electronics Co., Ltd. v. Int'l Union of Electronic, Electrical, Technical, Salaried and Machine Workers, AFL–CIO,* 6 F.3d 1511 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994), in which the plaintiffs had challenged the ITA's methodology for calculating the imputed commodity tax base for tax-adjustment purposes. The court of appeals explained that, while section 1677a(d)(1)(C)

> mandates a calculation of imputed tax amounts to be added to the USP, [it] does not specify to which USP the Korean taxes are to be applied as the product moves to the consumer. This determination is important because the Korean taxes are not a specific amount, but instead ad valorem in nature.... The Korean taxes must be applied to sales of goods at some discrete moment in the stream of commerce with or in the United States, a different market from that in which the cases should be levied, but are not, because of exportation.

6 F.3d at 1519 (footnote omitted). The opinion in *Federal–Mogul* noted that *Daewoo* concluded that the ITA's methodology of "determining where in the stream of commerce the Korean authorities applied the *ad valorem* tax rate in the home market and applying the same tax rate to USP calculated at the same point in the chain of commerce and adding this amount to USP" was based on substantial evidence, thereby implicitly recognizing that the *ad valorem rate,* not the *amount* of tax actually assessed in the home market, must be applied to the USP. 17 CIT at ——, 834 F.Supp. at 1397. The court therefore ordered the ITA to apply the Japanese VAT rate to USP and add the resulting amount to that price.

In *Avesta Sheffield, Inc. v. United States,* 17 CIT at ——, 838 F.Supp. at 615, the court agreed that "footnote 4 of *Zenith* does indeed appear to be *dicta* ". While the court disagreed that the key sentence in the body of the *Zenith* opinion conflicted with the agency's methodology, it concluded that *Federal–*

*Mogul* 's construction was consistent with the statutory language:

> ... [T]he underlined language does not address whether ITA is permitted to use the actual amount of taxes paid, perhaps because that issue was not before the Court of Appeals. Under the ITA's new approach, U.S. price would be increased "by the amount of tax that the exporting country would have assessed on the merchandise if it had been sold in the home market," at *home market* prices. The approach approved in *Federal–Mogul* would require a U.S. price adjustment by percentage of U.S. price, which treats the merchandise as "if it had been sold in the home market," at its actual price. Thus, neither approach conflicts directly with the key sentence in the body of *Zenith.* *Federal–Mogul's* construction is, however, in agreement with the wording of 19 U.S.C. § 1677a(d)(1)(C). The court has difficulty finding such agreement in ITA's construction.

17 CIT at ——, 838 F.Supp. at 614 (emphasis in original, footnote omitted). The court expressed its concern that the

> ITA may not be considering this matter carefully enough in light of *Federal–Mogul* and has chosen a tortured reading of the statute, which puts the court in the awkward position of rejecting a clear statement of the Court of Appeals or a well-reasoned opinion of this court that applies plain statutory language.... ITA is directed to reconsider this issue and ... advise the court ... whether it is acquiescing or whether it is appealing the *Federal–Mogul* line of cases.

17 CIT at ——, 838 F.Supp. at 615. On remand, the ITA adhered to *Federal–Mogul* [14], as it has in subsequent cases. *See, e.g., The Torrington Company v. United States,* 18 CIT ——, 866 F.Supp. 1434 (1994); *United Electrical Workers of America v. United States,* 18 CIT ——, Slip Op. 94–199, 1994 WL 730861 (Dec. 28, 1994); *The Timken Company v. United States,* 19 CIT ——, Slip Op. 95–20, 1995 WL 57726 (Feb. 10, 1995);

---

**14.** *See Redetermination on Remand, Final Determination of Sales at Less Than Fair Value, Certain Welded Stainless Steel Pipe From the Repub-* *lic of Korea (A–580–810),* Dep't of Commerce (May 2, 1994).

*Independent Radionic Workers of America v. United States,* 19 CIT ——, Slip Op. 95–45, 1995 WL 116219 (March 15, 1995); *Zenith Electronics Corp. v. United States,* 19 CIT ——, Slip Op. 95–46, 1995 WL 116204 (March 15, 1995); *Samsung Electronics Co. v. United States,* 19 CIT ——, Slip Op. 95–48, 1995 WL 116137 (March 16, 1995).

As indicated above, *Federal–Mogul* is on appeal, and plaintiffs' counsel, understandably, have suggested that the court consider holding relief on the motion of AK Steel Corp. *et al.* in abeyance pending the outcome of that appeal. However, the analysis articulated in *Federal–Mogul* and followed in the cases cited is persuasive.

### III

In accordance with the foregoing discussion, plaintiffs' motion for judgment on the ITA record compiled *sub nom. Notice of Final Determinations of Sales at Less Than Fair Value: Certain Hot–Rolled Carbon Steel Flat Products, Certain Cold–Rolled Carbon Steel Flat Products, Certain Corrosion-resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate From Germany,* 58 Fed.Reg. 37,136 (July 9, 1993), *amended,* 58 Fed.Reg. 44,170 (Aug. 19, 1993), must be denied.

Also in accordance with the foregoing discussion, the motion of AK Steel Corp. *et al.* for judgment on that same record must be granted to the extent that this matter is remanded to the ITA to recalculate the margin of dumping by (a) disallowing an adjustment for plaintiffs' currency-hedging gains and (b) multiplying the German VAT rate by the USP and increasing that price by the resultant amount.

The agency may have 60 days from the date hereof for such recalculation and reporting the results thereof.

So ordered.